

## NUMBER 13-09-00195-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**CHARLES ANTHONY CUEVA II,**                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                          **Appellee.**

---

### On appeal from the 347th District Court
### of Nueces County, Texas.

---

## OPINION

### Before Justices Rodriguez, Benavides, and Vela
### Opinion by Justice Rodriguez

Appellant Charles Anthony Cueva II challenges his conviction for one count of

indecency with a child and two counts of sexual assault of a child.   *See* TEX. PENAL

CODE ANN. § 21.11(a) (West Supp. 2010),[1] § 22.021(a)(1)(B) (West Supp. 2010).   By

four issues, Cueva argues that:   (1) the jury charge on one count of sexual assault

allowed for his conviction on a less than unanimous verdict; (2) the punishment charge

contained an erroneous instruction regarding the applicability of good conduct time to

his potential parole calculation; and (3-4) he received ineffective assistance of counsel.

We affirm.

## I. BACKGROUND

Indicted on eleven counts, Cueva pleaded not guilty to six counts of aggravated

sexual assault and one count of indecency with a child by contact.   The State

abandoned the remaining four counts before the trial began.   A jury convicted Cueva

of two counts of aggravated sexual assault and assessed punishment at seventy years

in prison and a $10,000 fine.[2]   *See* TEX. PENAL CODE ANN. § 22.021(e) (identifying

aggravated sexual assault as a first-degree felony), § 12.32 (West Supp. 2010)

(providing for first-degree felony punishment as imprisonment "for life or for any term of

not more than 99 years or less than 5 years" and "a fine not to exceed $10,000").[3]   It

---

[1]   Cueva was indicted for indecency with a child under an earlier version of section 21.11(a).   In 2009, amendments were made to this section removing from subsection (a) the words "and not the person's spouse" and adding the words "of age" in their place.   *See* Act of May 18, 2009, 81st Leg., R.S., ch. 260, § 1, 2009 TEX. GEN. LAWS 710 (current version at TEX. PENAL CODE ANN. § 21.11(a) (West Supp. 2010)).   Because the relevant portions of the prior and current statutes do not differ materially, we will refer to the current version of this section throughout this opinion.

[2]   The jury acquitted Cueva on two counts of aggravated sexual assault and could not reach a verdict on the remaining two counts.   The trial court declared a mistrial on those counts, and the State dismissed them.

[3]   The earlier version of section 22.021(e) also applies in this case.   When amended in 2007, no changes were made to subsection (e), which identifies the offense as a first degree felony.   *See* Acts 2007, 80th Leg., ch. 593, § 1.18, eff. Sept. 1, 2007 (current version at TEX. PENAL CODE ANN. § 22.021(e) (West Supp. 2010)).   Therefore, throughout the opinion, we will refer to the current version of this provision.   However, subsection (f), which provides that "[t]he minimum term of imprisonment for an

2

also convicted Cueva of the one count of indecency with a child and assessed punishment at fifteen years and a $10,000 fine. *See id.* § 21.11(d) (setting out that indecency with a child under subsection (a)(1) is a second-degree felony), § 12.33 (West Supp. 2010) (allowing for second-degree felony punishment as imprisonment "for any term of not more than 20 years or less than 2 years" and "a fine not to exceed $10,000"). The trial court ordered the sentences to run concurrently. Cueva filed a motion for new trial raising, among other issues, ineffective assistance of counsel claims. After hearing Cueva's motion for new trial, the trial court denied the motion and later issued extensive findings. This appeal followed.

## II. JURY CHARGE ISSUES

In his first two issues, Cueva complains of charge error. By his first issue, Cueva argues that the guilt-innocence jury charge allowed for his conviction for aggravated sexual assault on a less than unanimous verdict. By his second issue, Cueva argues that the jury charge at the punishment stage contained an erroneous instruction regarding the applicability of good conduct time to his potential parole calculation.

---

offense [of the first degree] under this section is increased to 25 years if … the victim is younger than six years of age at the time of the offense is committed," was also added as part of the 2007 amendment. *See id.* Although subsection (f) did not take effect until September 1, 2007 and does not apply in this case, we note this change because, as part of his ineffective assistance of counsel issue, Cueva complains that his counsel should have challenged the State's punishment-stage argument that the Legislature changed the law after Cueva committed the offenses to eliminate probation and increase the minimum sentence to twenty-five years and that Cueva benefited by committing the offenses before the law changed. In addition, earlier versions of sections of 12.32 and 12.33 apply, but because the relevant portions of the prior and current law do not differ materially, we will refer to the current version of these sections throughout this opinion. *See* Acts 2009, 81st Leg., ch. 87 (current version at TEX. PENAL CODE ANN. §§ 12.32, 12.33 (West Supp. 2010) (amending each section to remove from subsection (a) the words "institutional division" and adding the words "Texas Department of Criminal Justice" in their place).

3

## A. STANDARD OF REVIEW

In analyzing a jury charge issue, our initial inquiry is whether error exists in the charge submitted to the jury. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc). If error is found, the degree of harm necessary for reversal depends on whether the appellant preserved the error by objection. *Id.* If the defendant properly objected to the erroneous jury charge, reversal is required if we find "some harm" to the defendant's rights. *Id.* Here, Cueva concedes that he did not object at trial to either jury charge issue he raises on appeal, so we may only reverse if the record shows egregious harm. *See id.* at 743-44.

Egregious harm is a difficult standard that is determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002) (en banc); *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) (en banc); *see Igo v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006) (applying egregious harm analysis to erroneous parole and good conduct instructions). To determine whether a defendant suffered egregious harm, we assess the degree of harm in light of (1) the entire jury charge, (2) the state of the evidence, including contested issues, (3) the arguments of counsel, and (4) any other relevant information in the record. *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008); *see Almanza v. State*, 686 S.W.2d 157, 172 (Tex. Crim. App. 1985) (op. on reh'g). Errors that result in egregious harm are those that affect "the very basis of the case," "deprive the defendant of a valuable right," or "vitally affect a defensive theory." *Ngo*, 175 S.W.3d at 750; *Hutch*, 922 S.W.2d at 171 (citing *Almanza*, 686 S.W.2d at 172).

4

## B.  Unanimity of the Verdict on Count 4

### 1.  Applicable Law

The Texas Constitution requires a unanimous verdict in felony criminal cases. TEX. CONST. art. V, § 13; *see* TEX. CODE CRIM. PROC. ANN. art. 36.29(a) (West Supp. 2010).  A unanimous verdict is more than a mere agreement on a violation of a statute; it ensures that the jury agrees on the factual elements underlying an offense.  *Francis v. State*, 36 S.W.3d 121, 125 (Tex. Crim. App. 2000) (op. on reh'g) (en banc).  Generally, instructing a jury on alternative theories of committing the same offense does not violate the unanimity requirement.  *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004).  If a defendant is charged with multiple offenses, however, the trial court must instruct the jury that it cannot return a guilty verdict unless it unanimously agrees upon which offense the defendant committed.  *Gonzalez Soto v. State*, 267 S.W.3d 327, 335 (Tex. App.—Corpus Christi 2008, no pet.) (citing *Ngo*, 175 S.W.3d at 744).

We determine exactly what a jury must be unanimous about by examining the legislative intent of the applicable statute.  *Id.* (citations omitted).  The statute at issue here is section 22.021 of the penal code, which provides, in relevant part, that a defendant commits an offense if he intentionally or knowingly:

(i)     causes the penetration of the anus or sexual organ of a child by any means;

(ii)    causes the penetration of the mouth of a child by the sexual organ of the actor;

(iii)   causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor;

(iv)    causes the anus of a child to contact the mouth, anus, or sexual organ of another person, including the actor; or

5

> (v)     causes the mouth of a child to contact the anus or sexual organ of another person, including the actor; and

the victim is younger than fourteen years of age.   TEX. PENAL CODE ANN. § 22.021(a)(1)(B), (2)(B).   The Texas Court of Criminal Appeals has ruled that section 22.021 is a conduct-oriented offense in which the Legislature criminalized specific acts of conduct of several different types.   *Vick v. State*, 991 S.W.2d 830, 832 (Tex. Crim. App. 1999).   In other words, each of the above separately-described acts constitutes a separate statutory offense.   *Id.* at 833.   For example, an allegation that a defendant caused a child's sexual organ to contact his mouth is a separate and distinct offense from an allegation that the defendant penetrated the child's sexual organ with his sexual organ. *See id.*   Likewise, touching a child's breast and touching a child's genitals are separate offenses.   *See Francis*, 36 S.W.3d at 124.

For our purposes, however, there is one notable exception to *Vick's* general rule—the exception for subsumed conduct.   *See Patterson v. State*, 152 S.W.3d 88, 92 (Tex. Crim. App. 2004) (en banc); *Valdez v. State*, 211 S.W.3d 395, 400 (Tex. App.—Eastland 2006, no pet.); *Hendrix v. State*, 150 S.W.3d 839, 848 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd).   It is true that section 22.021 identifies different types of conduct that constitute separate offenses, even if the different acts occur in the same transaction.   *Valdez*, 211 S.W.3d at 400; *see Tyson v. State*, 172 S.W.3d 172, 178 (Tex. App.—Fort Worth 2005, pet. ref'd).   There are some cases, though, in which one of the acts would necessarily be subsumed by another, such as contact and penetration.   *Valdez*, 211 S.W.3d at 400; *see Gonzalez Soto*, 267 S.W.3d at 339.   In that event, what would appear under the charge to be two acts—contact and

penetration—is, essentially, one act for purposes of determining unanimity, and as such, the defendant's right to unanimity in his verdict is not violated because every juror who believed that the defendant penetrated the alleged victim "necessarily believed that the antecedent contact had occurred." *Valdez*, 211 S.W.3d at 400; *see Hendrix*, 150 S.W.3d at 848; *see also Patterson*, 152 S.W.3d at 92 (holding that penile contact with the alleged victim's mouth, genitals, or anus in the course of penile penetration is subsumed within the penetration offense).

## 2. Discussion

In his first issue, Cueva argues that the jury charge on Count 4 was erroneous because the jury could have found him guilty of aggravated sexual assault without unanimously agreeing that Cueva either contacted or penetrated A.G.'s anus. We disagree.

In Count 4, the jury was charged as follows:

> Now if you find from the evidence beyond a reasonable doubt that [Cueva], on or about August 5, 2007, in Nueces County, Texas, did then and there intentionally or knowingly cause his sexual organ to contact or penetrate the anus of [A.G.], and that [A.G] was then younger than 14 years of age and not the spouse of [Cueva], then you will find [Cueva] guilty of Count 4: Aggravated Sexual Assault Of A Child.
>
> Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find [Cueva] not guilty of Count 4: Aggravated Sexual Assault Of A Child.

The allegation that Cueva caused his sexual organ to contact A.G.'s anus is subsumed within the allegation that he penetrated A.G.'s anus with his sexual organ. Every juror who believed that Cueva penetrated A.G.'s anus necessarily believed that he contacted it. Unlike the cases in which the alleged conduct was contact or penetration of

7

separate body parts, here, Cueva could only be convicted under Count 4 if the jury determined that he assaulted A.G.'s anus.   In other words, the jury could not divide over whether Cueva assaulted one body part or another but, rather, necessarily had to agree that Cueva contacted or penetrated A.G.'s anus to return a guilty verdict.

Cueva argues that because A.G. testified to multiple instances of contact and penetration, the penetration-subsumes-contact exception does not apply to the facts of this case.   In support of his argument, Cueva cites the following three cases:   *Gonzalez Soto*, 267 S.W.3d at 339; *Martinez v. State*, 212 S.W.3d 411, 419-20 (Tex. App.—Austin 2006, pet. ref'd); and *Stewart v. State*, No. 14-08-00625-CR, 2009 Tex. App. LEXIS 2085, at *7 (Tex. App.—Houston [14th Dist.] May 5, 2009, no pet.) (mem. op., not designated for publication).   These cases are, however, distinguishable from the present case.

In *Gonzalez Soto*, the jury charge contained one count of aggravated sexual assault of a child and instructed the jury to convict Gonzalez Soto of the offense if he "intentionally or knowingly . . . cause[d] his sexual organ to contact the mouth" of the complainant or "intentionally or knowingly cause[d] his sexual organ to penetrate the mouth" of the complainant or "intentionally or knowingly cause[d] his finger to penetrate the sexual organ" of the complainant.   267 S.W.3d at 336.   At trial, the complainant "testified that there were two separate incidents in which appellant caused his penis to penetrate her mouth—one in her mother's bedroom and a second incident in her bedroom."   *Id.* at 339.

In *Martinez*, the jury charge, again, contained only one count of aggravated sexual assault of a child and instructed the jury to convict Martinez of the offense if he "knowingly and intentionally . . . cause[d] the penetration of the anus of [the complainant] . . . ,

8

cause[d] the anus of [the complainant] . . . to contact the sexual organ" of Martinez. 212 S.W.3d at 415. The aggravated sexual assault count did not include the word "and" or "or" in between the "penetration" phrase and "contact" phrase. *Id.* At trial, the complainant "testified that the abuse happened on more than one occasion." *Id.* at 414.

In *Stewart*, the jury charge also contained one count of aggravated sexual assault of a child and allowed conviction for the offense if "on or about the 2nd day of January, 2005," the appellant "intentionally or knowingly cause[d] the contact or penetration of the anus or female sexual organ of [the complainant] . . . by [Stewart]'s sexual organ . . . ." 2009 Tex. App. LEXIS 2085, at *8-9. At trial, the complainant testified that the defendant "touched his private parts to her private parts on three occasions in January 2005." *Id.* at *2.

Here, the jury was instructed in seven separate counts regarding different alleged offenses on different dates. The only detailed testimony offered by A.G. concerning contact or penetration of her anus was the incident on August 5, 2007, in which A.G.'s mother walked in on Cueva in a compromising position with A.G. We acknowledge that A.G. testified that Cueva touched her with his "private" on her "front" and "back" "more than one time." A.G.'s mother also testified that A.G. told her "it had happened more than once. She did not specify exactly when. She just said whenever I would shower or leave." Carol McLaughlin, the Sexual Assault Nurse Examiner (S.A.N.E.), testified similarly, stating that A.G. told her that Cueva "does this every time when my mom leaves."

However, unlike *Gonzalez Soto*, *Martinez* and *Stewart*, in which the complainants testified clearly about multiple incidents yet the jury charges contained only one count of

9

aggravated sexual assault, the jury at Cueva's trial was charged with multiple counts of aggravated sexual assault on multiple dates and A.G.'s vague recollections that Cueva had touched her on more than one occasion did not create a danger that the jury would confuse the specific testimony regarding the incident on August 5, 2007—the incident charged in Count 4—with the unspecified instances A.G. alluded to in her comment that Cueva had touched her "more than one time." *Gonzalez Soto*, *Martinez*, and *Stewart* are, therefore, inapplicable to the facts of this case, and we are not persuaded by Cueva's argument that the penetration-subsumes-contact exception does not apply to Count 4.

Based on the foregoing, we conclude that no error existed that violated Cueva's right to unanimity in his verdict in Count 4 of the jury charge. *See Ngo*, 175 S.W.3d at 743-44. Having found no error, we need not address harm. *See id.* at 743. Cueva's first issue is overruled.

### C. GOOD CONDUCT TIME AND PAROLE CHARGE INSTRUCTION

By his second issue, Cueva contends, and the State agrees, that the trial court's punishment charge improperly instructed the jury that good conduct time would be added to actual time served to determine when Cueva would be eligible for parole. Given that Cueva did not object to this portion of the punishment charge, the question for this Court is whether Cueva was egregiously harmed by this error. *See id.* at 743-44.

### 1. Applicable Law

For certain offenses, including those for which Cueva was convicted, article 37.07, section 4(a) of the code of criminal procedure requires that the following parole law instruction be included in the punishment charge:

Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, *without consideration of any good conduct time he may earn*. If the defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

TEX. CODE. CRIM. PROC. ANN. art. 37.07, § 4(a) (West Supp. 2010) (emphasis added); *see id.* at art. 42.12, § 3g(a)(1) (West Supp. 2010).

## 2. Discussion

While the mandatory parole instruction was given in the punishment jury charge, the trial court erred when it included the following italicized language in the third paragraph of its parole instruction:

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment he will not become eligible for parole until the actual time served *plus any good conduct time earned* equals one-half of

11

the sentence imposed or 30 years, whichever is less. Eligibility for parole does not guarantee that parole will be granted.

(Emphasis added.) Cueva argues that, by this error, the trial court essentially instructed the jury that he would become eligible for parole much earlier than he actually would be under the correct law. Cueva asserts that the jury responded to this erroneous instruction by imposing extremely lengthy sentences that were "especially harsh"—seventy years for each count of aggravated sexual assault and fifteen years for indecency with a child. He argues that "[t]he trial court's gross misstatement of the law misled the jury and adversely affected how it viewed parole and good conduct time, which the charge plainly authorized the jury to consider." Cueva contends that "the erroneous parole instruction affected the very basis of the sentences and caused egregious harm." We disagree.

The court of criminal appeals has refused to find that a similar error of this nature was egregious error. *See Igo*, 210 S.W.3d at 647. In *Igo*, the punishment charge informed the jury that Igo "would not become eligible for parole until the actual time served, plus good time, equaled one-fourth of the sentence imposed," when it should have been instructed that Igo "would not become eligible for parole until the actual time served, *without considering good time*, equaled *one-half* of the sentence imposed." *Id.* at 646. Concluding that the error resulted in no egregious harm, the *Igo* Court reasoned as follows:

> Although appellant did receive the maximum sentence, a number of other factors mitigate against a finding of egregious harm. First, the parole instruction contained the standard curative language admonishing the jury not to consider the extent to which the parole law might be applied to the defendant. Second, parole was not mentioned by either counsel during

12

> argument on punishment.   And finally, the evidence relating to punishment was exceptionally strong.

*Id.* at 647; *see Ross v. State*, 133 S.W.3d 618, 623 (Tex. Crim. App. 2004) (finding a similar error to be harmless, so long as there was no reasonable probability that the jury was misled into believing that if the defendant received a life sentence he might become eligible for parole in less than forty years through the award of good conduct time or that he was certain to be released after he became eligible for parole); *Stewart v. State*, 293 S.W.3d 853, 855-62 (Tex. App.—Texarkana 2009, pet. ref'd) (being guided by the analysis provided in *Igo*, the Texarkana Court concluded that a substantially similar punishment charge error was not egregious); *Warner*, 245 S.W.3d at 461 (explaining that egregious harm is assessed in light of the entire jury charge, the state of the evidence, the arguments of counsel, and any other relevant information in the record).

In this case, Cueva was sentenced to a substantial, but not the maximum, sentence on the two counts of aggravated sexual assault.   *See* Tex. Penal Code Ann. §§ 12.31, 22.021(e).   The seventy-year sentences were to run concurrently with the fifteen-year sentence assessed for his indecency-with-a-child conviction.   Moreover, the instruction in question effectively told the jury that its sentence would have an effect on when Cueva became eligible for parole if that sentence was sixty years or less, but that, for sentences over sixty years, a thirty-year term would automatically apply.   Because the two significantly longer sentences in this case were for seventy years each, they were outside the range within which this section applied.   Therefore, there was no parole-based incentive to lengthen the sentences beyond sixty years, and it is reasonable to conclude that the jury chose seventy-year sentences for other reasons.

13

In addition, the jury charge contained the standard curative instruction which consisted of a total of five paragraphs, only one of which contained an error. *See Igo*, 210 S.W.3d at 647. While the charge erroneously instructed the jury concerning when Cueva might become eligible to be considered for parole, it did inform the jurors, in accordance with the statute, that they were not to consider the manner in which the parole law may be applied to Cueva. Assuming the jury followed this instruction, *see Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009), we conclude, as did the Beaumont Court in *Stewart v. State*, that "[t]his factor, alone, does not dictate a finding of egregious harm." 293 S.W.3d at 857; *see Igo*, 210 S.W.3d at 647.

Furthermore, neither parole nor good conduct time was mentioned during punishment arguments. This suggests that the issue of the parole law was not central to the punishment stage of the case. *See Igo*, 210 S.W.3d at 647; *Stewart*, 293 S.W.3d at 859.

Finally, we assess harm based, in part, on the state of the evidence. *See Warner*, 245 S.W.3d at 461; *Stewart*, 293 S.W.3d at 857. The State's punishment evidence set out a number of undesirable changes noted in A.G.'s behavior following Cueva's actions. The evidence also highlighted conditions for probation and the unlikelihood that Cueva, who was described as an opportunistic and impulsive person, would successfully complete any probation period. And Cueva had been found guilty of repeatedly sexually assaulting and fondling A.G., a five-year-old girl, who was in the vulnerable position of becoming his step-daughter. The above evidence, as well as the "visceral nature of the offense itself[,] offer sufficient support to explain the jury's assessment of punishment without suggesting harm from the charge." *Stewart*, 293 S.W.3d at 858.

14

Under the stringent standards necessary to show egregious harm, *see Ellison*, 86 S.W.3d at 227; *Hutch*, 922 S.W.2d at 171, we conclude that this error did not affect the very basis of his sentences, as urged by Cueva. *See Ngo*, 175 S.W.3d at 750; *Hutch*, 922 S.W.2d at 171. Egregious harm has not been shown. Cueva's second issue is overruled.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

By his third issue, Cueva complains that he received ineffective assistance of counsel during the guilt-innocence stage and, by his fourth issue, that he received ineffective assistance during the punishment stage. By more than twenty-five sub-issues, Cueva asserts that he was denied effective assistance of counsel for failing to investigate, failing to admit evidence, eliciting or failing to object to testimony, failing to object to arguments made by the prosecutor, making improper jury arguments, and failing to object to the jury charges.

The trial court imposed sentence against Cueva on March 12, 2009 and signed the judgment of conviction on March 25, 2009. Cueva timely filed a motion for new trial on April 13, 2009, bringing a number of ineffective-assistance-of-counsel claims. *See* TEX. R. APP. P. 21.8 (explaining that a defendant may file a motion for new trial no later than 30 days after the date the trial court imposes or suspends sentence in open court). Cueva's motion was heard on May 14, 15, and 21, 2009, at which time Cueva's trial counsel testified and the trial court admitted, as exhibits, the psychological evaluation, curriculum vitae, and supplemental affidavit of defense expert, Paul Hamilton, Ph.D., and the

15

psychiatric evaluation of the State's expert, Joel Kutnick, M.D.[4]  Cueva asserted, over

the State's objection, additional complaints of ineffective assistance for the first time at the

hearing.   The trial court denied the motion for new trial by written order on May 26, 2009,

the seventy-fifth day after Cueva's sentence was imposed in open court.   *See id.* ("The

court must rule on a motion for new trial within 75 days after imposing or suspending

sentence in open court.").   Seven days later, on June 1, 2009, Cueva requested findings

of fact.   Cueva appealed from the judgment.   On appeal, Cueva included complaints of

ineffective assistance of counsel made for the first time on appeal.

On July 1, 2009, the trial court signed and filed its findings.   The trial court

summarized its findings as follows in finding of fact 4 (guilt-innocence stage) and finding

of fact 44 (punishment stage):

> The Court finds that, with regard to each of the claims individually,
> and as a whole, Cueva has failed to prove by a preponderance of the
> evidence either that [counsel's] performance was deficient or outside the
> range of competence demanded of attorneys in criminal cases, or that it is
> reasonably probable that the alleged deficiencies, individually or together,
> prejudiced his defense to the extent that, but for the supposed deficiencies,
> Cueva would not have been found guilty at trial or the result of the
> proceeding would have been different.

The trial court filed sixty-one additional findings of fact, specific as to Cueva's

ineffective-assistance-of-counsel claims.

## A.  Trial Court's Findings

As a threshold issue, the State asserts that we should not consider the trial court's

findings because the trial court did not make its findings when it ruled on Cueva's motion

---

[4] The defense rested on May 15, 2009.   On May 21, 2009, after Dr. Kutnick's affidavit was formally
admitted, without objection, the State rested, and each side presented closing argument.

for new trial.[5]   The trial court imposed sentence against Cueva in open court on March 12, 2009 and denied Cueva's motion for new trial seventy-five days later, on May 26, 2009.   The trial court's findings were filed on July 1, 2009, more than one month after it ruled on the motion and more than 100 days after sentence was imposed.   The State asserts that discretionary rule of appellate procedure 21 "ties" the trial court's findings to its ruling on the motion, and, therefore, those findings, like the ruling, must have been made within seventy-five days after the trial court imposed Cueva's sentence.   *See* TEX. R. APP. P. 21.8(a)-(b).   We disagree.

Texas Rule of Appellate Procedure 21 provides, in relevant part, the following trial court process for ruling on a motion for a new trial and for making findings of fact:

(a)   *Time to rule.*   The court must rule on a motion for new trial within 75 days after imposing or suspending sentence in open court.

(b)   *Ruling.*   In ruling on a motion for new trial, the court may make oral or written findings of fact.…

*Id.*   The earlier version of rule 21.8(b) set out that "[i]n ruling on a motion for new trial, the court must not summarize, discuss, or comment on evidence."   *Landers v. State*, 256 S.W.3d 295, 301 n.4 (Tex. Crim. App. 2008).   Now, "the court may make oral or written findings of fact."   TEX. R. APP. P. 21.8(b).

"The rationale for the change in the rule is to ensure that appellate courts will not need to speculate as to the possible factual findings supporting a trial judge's ruling if the trial judge will articulate them."   *Landers*, 256 S.W.3d at 301 n.4 (citing *State v. Cullen*, 195 S.W.3d 696, 698 (Tex. Crim. App. 2006) (noting that a trial court's refusal to enter

---

[5] While Cueva challenges most findings, he does not argue that the findings should not be considered because they were untimely made by the trial court.

findings of fact "leaves appellate courts with nothing to review except a one-word ruling and forces the courts of appeals to make assumptions about the trial court's ruling" where "[t]he ruling could be based on a mistake of law, on the trial court's disbelief of the testimony presented, or even on a clerical error")); *see In re Gillespie*, 124 S.W.3d 699, 703 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (explaining, in a civil context, that the expiration of the trial court's plenary power does not affect or diminish the trial court's ability to make and file amended findings of fact). Unlike the Texas Rules of Civil Procedure, appellate rule 21.8 provides no time frame for requesting or filing findings or amended findings. *Compare* TEX. R. APP. P. 21.8, *with* TEX. R. CIV. P. 296 (providing that appellant shall file his request for findings within twenty days after the judgment is signed) *and id.* at R. 297 (setting out, among other things, that the court shall file its findings within twenty days after a timely request is filed), *and id.* at R. 298 (providing "[a]fter the court files original findings of fact …, any party may file with the clerk of the court a request for specified additional or amended findings … within ten days after the filing of the original findings … by the court").

Guided by this rationale, we conclude that rule 21 does not require the trial court to make its findings within the same seventy-five-day period it has to rule on the motion for new trial, and we will, therefore, consider all relevant trial court findings. *See* TEX. R. APP. P. 21.8(a)-(b). We do so in an effort to ensure that we will not need to speculate as to the possible factual findings supporting the trial court's ruling. *See Landers*, 256 S.W.3d at 301 n.4. Furthermore, even were we to conclude that the trial court made its extensive and explicit written findings in error because the findings were issued after the expiration of the time period within which it was required to rule on the motion, the findings

are, at worst, harmless. A reviewing court must defer to any plausible, implied factual findings that are reasonable and supported by the record and that would uphold the trial court's ruling.[6] *See Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005). As discussed in detail below, the trial court's factual findings, in this case, are those which we would imply as necessary to support the ruling and to which we would defer because they are both reasonable and supported in the record. *See id.*

The State also suggests that we should not consider the trial court's findings because certain specific deficiency findings are inconsistent with the trial court's general finding that "Cueva has failed to prove by a preponderance of the evidence … that [counsel's] performance was deficient or outside the range of competence demanded of attorneys in criminal cases." However, when this general finding is read in its entirety, we find no such inconsistency

Finding of fact 4 set out, generally, that Cueva failed to prove that counsel's performance was deficient *or* that a deficiency, if any, prejudiced his defense. Likewise, after each specific finding of deficiency, the trial court found that the deficiency, if any, did not prejudice Cueva's defense. For example, by its specific finding 31, the trial court found that counsel's "failure to ask for an instruction to disregard or a mistrial regarding improper testimony by [A.G.'s] mother about an extraneous assault fell below an objective standard of reasonableness under the prevailing professional norms." In finding 32, the trial court then found that "any deficient performance did not cause prejudice."

---

[6] Although Cueva filed his notice of appeal on April 7, 2009, almost three months before the court's findings were filed on July 1, 2009, he did not file his brief until February 8, 2010. Cueva does not argue that the filing of the findings more than 100 days after sentence was imposed harmed him, *i.e.*, that he was denied the opportunity to properly present his appeal. Rather, on appeal, Cueva had the opportunity to, and did, attack most of the trial court's findings.

19

Therefore, the State's argument is not persuasive. As concluded above, all specific findings support the general language of finding 4, and we will consider all relevant trial court findings.

## B. STANDARDS OF REVIEW AND APPLICABLE LAW

### 1. Claims Raised in Motion for New Trial

Appellate issues involving claims brought in a motion for new trial are really challenges to the trial court's ruling on the motion. *See Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004), *superseded in part by rule of appellate procedure 21.8(b) on other grounds*, *as recognized by State v. Herndon*, 215 S.W.3d 901, 905 n.5 (Tex. Crim. App. 2007); *Shanklin v. State*, 190 S.W.3d 154, 158 (Tex. App.—Houston [1st Dist.] 2005), pet. dism'd, 211 S.W.3d 315 (Tex. Crim. App. 2007); *see also Delgado v. State*, 13-09-00300-CR, 2010 Tex. App. LEXIS 6730, at *4-5 (Tex. App.—Corpus Christi Aug. 19, 2010, no pet.) (mem. op., not designated for publication). We review a denial of a motion for new trial under an abuse of discretion standard. *Charles*, 146 S.W.3d at 208; *see Shanklin*, 190 S.W.3d at 158; *see also Delgado*, 2010 Tex. App. LEXIS 6730, at *4-5. A trial court abuses its discretion by denying a motion for new trial only when its decision is arbitrary or unreasonable—that is, when no reasonable view of the record could support the trial court's ruling. *Charles*, 146 S.W.3d at 208; *see Escobar v. State*, 227 S.W.3d 123, 126 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). Under the facts of this case, we will, therefore, review the two prongs of *Strickland v. Washington*, set out below, through this abuse of discretion standard of review, reversing only if the trial court's decision, as to the claims raised in Cueva's motion, is arbitrary or unreasonable. *Charles*, 146 S.W.3d at 208; *My Thi Tieu v. State*, 299 S.W.3d 216, 223 (Tex.

App.—Houston [14th Dist.] 2009, pet. ref'd); *Shanklin*, 190 S.W.3d at 158-59; *see Strickland*, 466 U.S. 668, 87 (1984); *State v. Gill*, 967 S.W.2d 540, 542 (Tex. App.—Austin 1998, pet. ref'd) (holding that when a trial court grants a motion for new trial on the basis of ineffective assistance of counsel, an appellate court should review the standards of *Strickland* through a prism of the abuse of discretion standard and decide whether the trial court's decision to grant a new trial was so outside the zone of reasonable disagreement that it is subject to reversal).

Moreover, when the trial court files findings, as in this case, "[a]n appellate court should defer to the trial court's findings of facts regarding the credibility and demeanor of the witnesses, viewing the evidence in the light most favorable to the trial judge's rulings." *Gamboa*, 296 S.W.3d at 584; *see My Thi Tieu*, 299 S.W.3d at 223; *Shanklin*, 190 S.W.3d at 158-59; *see also* TEX. R. APP. P. 21.8. Because the trial judge is the sole judge of the credibility of the witnesses, a trial court does not abuse its discretion by denying a motion for new trial based on conflicting evidence. *See Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). And we "presume that all reasonable factual findings that could have been made against the losing party were made against that losing party." *Charles*, 146 S.W.3d at 208 (citing *Quinn v. State*, 958 S.W.2d 395, 402 (Tex. Crim. App. 1997); *Beck v. State*, 573 S.W.2d 786, 791 (Tex. Crim. App. 1978) (noting that, at a motion for new trial hearing, the trial judge has "the right to accept or reject any part of" a witness's testimony)).

We utilize a two prong *Strickland* analysis to determine whether counsel's representation was so deficient that it violated a defendant's constitutional right to effective assistance of counsel. *See Strickland*, 466 U.S. at 687. Appellant must show

by a preponderance of the evidence that (1) counsel's performance was deficient, and (2) the deficiency prejudiced the defense. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010); *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.—Corpus Christi 2006, no pet.); *see Strickland*, 466 U.S. at 687; *Ex parte Martinez*, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006). A defendant's failure to satisfy one prong negates the court's need to consider the other prong. *Strickland*, 466 U.S. at 697; *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009), cert. denied, 130 S. Ct. 3411 (2010).

Counsel's performance is deficient when his representation falls below an objective standard of reasonableness. *Ex parte Briggs*, 187 S.W.3d 458, 466 (Tex. Crim. App. 2005); *Strickland*, 466 U.S. at 687-88. In determining whether there is a deficiency, we afford great deference to trial counsel's ability, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and that counsel's actions were the result of sound and reasonable trial strategy. *Jaynes*, 216 S.W.3d at 851. Decisions rooted in strategy do not constitute deficient performance. *Strickland*, 466 U.S. at 689. Unless a defendant can show in the record that counsel's conduct was not the product of a strategic decision, "a reviewing court should presume that trial counsel's performance was constitutionally adequate 'unless the challenged conduct was so outrageous that no competent attorney would have engaged in it.'" *State v. Morales*, 253 S.W.3d 686, 696-97 (Tex. Crim. App. 2008) (en banc) (quoting *Goodspeed*, 187 S.W.3d at 392); *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007) (quoting *Goodspeed*, 187 S.W.3d at 392); *cf. Andrew v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005) ("[W]hen

22

no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as she did.").

A defendant must also show that counsel's deficiency caused prejudice—i.e., that the "errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To show prejudice, the defendant "must show there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different." *Smith v. State*, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009) (citing *Strickland*, 466 U.S. at 694). A reasonable probability of prejudice is a "probability sufficient to undermine confidence in the outcome," meaning "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* (citing *Strickland*, 466 U.S. at 687); *Mallett v. State*, 65 S.W.3d 59, 62 (Tex. Crim. App. 2001) (explaining that a lawyer's deficient performance must undercut the "proper functioning of the adversarial process" such that the result of the trial cannot be reliable). "While the ultimate question of prejudice under Strickland is to be reviewed de novo, the trial court should be afforded deference on any underlying historical fact determinations." *Escobar*, 227 S.W.3d at 127 (quoting *Johnson*, 169 S.W.3d at 239).

"This right [to effective assistance of counsel] does not mean errorless or perfect counsel whose competency of representation is to be judged by hindsight." *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). "The 'right to effective assistance of counsel merely ensures the right to reasonably effective assistance.'" *Id.* (quoting

23

*Rylander v. State*, 101 S.W.3d 107, 109-10 (Tex. Crim. App. 2003) (en banc)). "Allegations of ineffectiveness of counsel must be firmly founded in the record," *Escobar*, 227 S.W.3d at 127 (citing *Mallett*, 65 S.W.3d at 63), and a silent record that provides no explanation for counsel's actions typically will not overcome the strong presumption of effective assistance. *Rylander*, 101 S.W.3d at 110-11; *Shanklin*, 190 S.W.3d at 158-59.

## 2. Other Claims

There are significant differences between the claims Cueva raised in his timely-filed motion for new trial and the claims Cueva argued at the hearing. Texas Rule of Appellate Procedure 21.4(a)-(b) provides, in relevant part, the following procedure for filing and amending a motion for new trial filed in a criminal case:

> (a) *To file*. The defendant may file a motion for new trial before, but no later than 30 days after, the date when the trial court imposes or suspends sentence in open court.

> (b) *To amend*. Within 30 days after the date when the trial court imposes or suspends sentence in open court but before the court overrules any preceding motion for new trial, a defendant may, without leave of court, file one or more amended motions for new trial.

TEX. R. APP. P. 21.4(a)-(b). In addition, a defendant may not amend or enlarge his original motion with additional claims after the thirty-day period has expired, except when the State fails to object to the addition at the time those claims are raised. *Clarke v. State*, 270 S.W.3d 573, 580-81 (Tex. Crim. App. 2008) (citing *State v. Moore*, 225 S.W.3d 556, 570 (Tex. Crim. App. 2007)); *see Jordan v. State*, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994) (en banc) (setting out that the purpose of the hearing is for a defendant to fully develop the issues raised in this motion for new trial). Thus, rule 21.4(b) permits the

24

State, after properly objecting, to insist that the trial court rule only upon the timely motion for new trial as originally filed or timely amended, but not as untimely amended. *See* TEX. R. APP. P. 21.4(b); *see also Moore*, 225 S.W.3d at 570.

At the hearing on his motion for new trial, which occurred after the relevant thirty-day period had expired, Cueva attempted to enlarge or amend his original motion with additional ineffective-assistance claims. *See Clarke*, 270 S.W.3d at 580-81. The State objected to these additional claims. Because the State did so, the trial court should have ruled only on the motion for new trial as it was originally filed. *See* TEX. R. APP. P. 21.4(b); *Moore*, 225 S.W.3d at 570. Instead, the trial court allowed Cueva to present evidence on his additional claims and considered this evidence, in error. *See* TEX. R. APP. P. 21.4(b); *Moore*, 225 S.W.3d at 570.

Nevertheless, it is well settled that ineffective assistance of counsel may be raised without the necessity of a motion for new trial. *See Robinson v. State*, 16 S.W.3d 808, 809-13 (Tex. Crim. App. 2000). We, therefore, will consider these additional claims and arguments under the *Strickland* standard, based only on the trial record, without giving consideration to the evidence presented at the hearing on Cueva's motion for new trial or to the trial court's findings relevant to those claims. *See Strickland*, 466 U.S. at 687; *see also* TEX. R. APP. P. 21.4(b); *Moore*, 225 S.W.3d at 570.

In addition, Cueva raises other claims of ineffective assistance of counsel for the first time on appeal. The *Strickland* standard also applies to these new claims. *See Strickland*, 466 U.S. at 687. Therefore, the claims raised for the first time at the hearing on the motion for new trial and objected to by the State and those made for the first time on appeal will be reviewed together.

25

## C. Discussion

### 1. Claims Raised in Motion for New Trial

We will first address the ineffective-assistance-of-counsel claims that Cueva presented in his motion for new trial and now asserts as part of his third and fourth issues on appeal. The trial court denied Cueva's motion and filed findings regarding these claims. As set out above, we will review the claims raised in Cueva's motion for new trial under an abuse of discretion standard. *See Charles*, 146 S.W.3d at 208.

#### a. Cueva's Written Statement

Cueva first asserts that counsel's performance was deficient and that he was harmed when counsel (1) failed to investigate matters and present evidence related to the voluntariness of his written statement, (2) withdrew the motion to suppress his written statement when counsel changed trial strategy, and (3) failed to request a jury instruction on voluntariness.

A defendant's statement must be voluntary to be admissible. U.S. CONST. amends. V & XIV; *Jackson v. Denno*, 378 U.S. 368, 376-77 (1974); *see* TEX. CODE CRIM. PROC. ANN. arts. 38.21, 38.22 § 2(b) (West 2005) (providing that a statement is admissible if made freely and voluntarily without compulsion or persuasion and the defendant knowingly, intelligently, and voluntarily waives statutory rights). A confession may be involuntary under the Due Process Clause only when there is police coercion or overreaching. *See Colorado v. Connelly*, 479 U.S. 157, 163-66 (1985); *Oursbourn v. State*, 259 S.W.3d 159, 169-71 (Tex. Crim. App. 2008). However, even absent coercion or overreaching, a confession may still be involuntary under the broader protections of Texas statutory law. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 6. The court of

26

criminal appeals has set out the following fact scenarios, among others, that can raise a state-law claim of involuntariness:   "(1) the suspect was ill and on medication and that fact may have rendered his confession involuntary; (2) the suspect was mentally retarded and may not have 'knowingly, intelligently and voluntarily' waived his rights; [or] (3) the suspect 'lacked the mental capacity to understand his rights' …."   *Oursbourn*, 259 S.W.3d at 172-73.

When assessing the reasonableness of an attorney's investigation, a reviewing court must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further.   *Ex parte Martinez*, 195 S.W.3d at 721 (citing *Wiggins v. Smith*, 539 U.S. 510, 527 (2003)).   The Supreme Court has set out the following concerning the duty to investigate:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.   In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.   In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Wiggins*, 539 U.S. at 521-23; *see Ex parte Martinez*, 195 S.W.3d at 721; *Ex parte Briggs*, 187 S.W.3d at 466-67.   In *Strickland*, the Supreme Court concluded that "the decision not to seek more character or psychological evidence than was already in hand was likewise reasonable" and that "[t]rial counsel could reasonably surmise from his conversations with respondent that character and psychological evidence would be of

27

little help."[7] 466 U.S. at 699. In addition, the defendant himself bears the primary duty to divulge to his attorney evidence of his own physical and emotional conditions that might have a bearing on the issues at trial. *See Ex parte Martinez*, 195 S.W.3d at 738 (providing that "the failure to present evidence of the alleged sexual abuse is borne primarily by applicant, as he had ample opportunity to divulge this evidence to his lawyer … before trial"). Also, when the facts adduced at trial and at any hearings concerning ineffectiveness do not show that the defensive issue in question would have been viable, trial counsel is not deficient for failing to further investigate and pursue that defense at trial. *See Ex parte Martinez*, 195 S.W.3d at 724; *Ex parte Lilly*, 656 S.W.2d 490, 493 (Tex. Crim. App. 1983) (en banc).

In this case, the trial court found credible counsel's testimony, given at the hearing, regarding Cueva's written statement given to the police and its voluntariness. Specifically, the trial court's findings set out that the following testimony, provided by counsel at the hearing, was credible: (1) "[counsel] changed his initial strategy of attempting to exclude Cueva's statement and instead attempted to use the statement at trial to show how the investigation had been 'botched' by the police" when they allowed "the video recording to cut off in the middle of the taped statement and then attempt[ed] to complete the statement with an unrecorded written confession"; (2) "[counsel] did not believe he needed to have Cueva psychologically examined" based on meetings with Cueva and with members of his family; and (3) "no one from Cueva's family mentioned

---

[7] In *Strickland v. Washington*, the Supreme Court identified the ABA Standards for Criminal Justice as one guide to determine what is reasonably expected of defense counsel. *See* 466 U.S. 668, 688 (1984). Under the section titled "Prompt Action to Protect the Accused," those standards encourage counsel to consider numerous means to protect the client, including "obtaining psychiatric examination of the accused *when a need appears*." ABA STANDARDS FOR CRIMINAL JUSTICE 4-3.6 (3rd Ed. 1993) (emphasis added).

28

that he was slow in school or expressed concern with his mental or psychological condition." The trial court also found that counsel "made a reasonable determination, based on the facts available to him at the time, that he did not need a professional evaluation of, or further investigation into, Cueva's psychological condition" and "[t]hus, had no reasonable grounds to oppose or question the voluntariness of the statement based on Cueva's psychological condition."

As part of its findings, the trial court addressed the opinions rendered by Paul Hamilton, Ph.D., a psychologist who, after trial, examined Cueva for the defense to determine whether he understood his Miranda warnings and the sworn, written statement. The trial court found "implausible the opinions rendered by Dr. Paul Hamilton … "that Cueva's 'emotional disturbance in combination with certain personality characteristics … led him to sign a sworn, written statement without fully reading it and understanding its content, thereby rendering it unknowing and involuntary' … especially in light of the controverting affidavit and report of … Joel Kutnick[, M.D.,] disputing this opinion and finding 'no specific cognitive defects or attentional disorder.'" *See Lewis*, 911 S.W.2d at 7.

The trial court further found that,

> [counsel's] abandonment of the motion to suppress and his failure to ask for a voluntariness instruction to the jury charge did not fall below an objective standard of reasonableness under the prevailing professional norms, in light of the fact that [counsel] had no reason to believe that Cueva could raise a legitimate challenge to the voluntariness of the statement.

It concluded by finding "that abandonment of the motion to suppress was a reasonable trial strategy under the circumstances in order to use the statement against the police and to show how the overall investigation had been mishandled."

29

We also note that absent from the record is any indication that Cueva himself expressed to his trial attorney that he was too slow or emotionally impaired to voluntarily make the statement in question. *See Ex parte Martinez*, 195 S.W.3d at 738. Rather, at trial, Cueva claimed only that he did not read the statement because he knew the officer in question and trusted him to have typed it up correctly.

Therefore, deferring to the trial court's findings of facts regarding the credibility and demeanor of the witnesses and viewing the evidence in the light most favorable to the trial judge's rulings, *see Gamboa*, 296 S.W.3d at 584, we conclude that the trial court's decision that counsel's actions in this regard were not deficient was not an abuse of discretion. *See Charles*, 146 S.W.3d at 208; *see also Strickland*, 466 U.S. at 687. Cueva has not demonstrated that counsel performed "below an objective standard of reasonableness" on this basis. *See Ex parte Briggs*, 187 S.W.3d at 466.

### b.  "Victim" Language

Cueva complains that counsel's actions were deficient when counsel referred to A.G. as the victim at least five times during the course of the trial and, by his actions, conceded that Cueva had committed a crime. He contends that counsel's purported strategic explanation for his conduct was unsound. Cueva also asserts that the prejudicial effect of counsel's use of this word was compounded when the State and its witnesses described A.G. as the victim twenty-three times during the guilt-innocence stage, without objection. In response, the State argues the following:

> "Victim" is a convenient label that identifies who the witnesses and attorneys are arguing about. It is a more common and commonly understood term, and less stuffy than "complainant," less awkward than continuing to refer to the person as the "alleged victim," and does not suggest what may be perceived as inappropriate familiarity in referring to

the person by their [sic] name. Moreover, in view of the vigorous defense presented in the present case, there should have been no doubt in the jury's mind that it was merely being used as a convenient label and not as any sort of admission that the crime actually occurred.

Cueva cites *Talkington v. State* and *Veteto v. State* for the proposition that references to the complainant as the "victim" are improper when made by the trial court because they constitute comments on the weight of the evidence. *See Talkington*, 682 S.W.2d 674, 674-75 (Tex. App.—Eastland 1984, pet. ref'd) (explaining that the trial court's reference in its charge to the "victim" in a rape case was an improper comment on the weight of evidence because there was no dispute that sexual intercourse had occurred and the sole issue was whether it was consensual and whether the complainant was truly a "victim"); *Veteto*, 8 S.W.3d 805, 816-17 (Tex. App.—Waco 2000, pet. ref'd), *abrogated on other grounds by State v. Crook*, 248 S.W.3d 172, 174-75 (Tex. Crim. App. 2008) (determining that the trial court "gave credence to [the complainant's] testimony that the assaults occurred and that she was, indeed, a victim" by referring to the complainant as the victim instead of the alleged victim and concluding that the trial court commented on the weight of the evidence by failing to refer to A.L. as the "alleged" victim). Cueva asserts that references to "victim" by lawyers and witnesses are equally improper and unfairly prejudicial, not because they are comments on the weight of the evidence, but because the references suggest personal opinions that a crime occurred.

Cueva refers this Court to *Craig v. State* and *Doherty v. State* as cases that are sufficiently analogous to the present case so as to lend support to his argument. *See Craig*, 847 S.W.2d 434, 435-36 (Tex. App.—El Paso 1993, no pet.); *Doherty*, 781 S.W.2d 439, 441-42 (Tex. App.—Houston [1st Dist.] 1989, no pet.). On remand, the *Craig* Court

31

reviewed counsel's effectiveness only at the punishment stage, not the guilt-innocence stage, and considered the effect of his performance by applying the then-accepted *Duffy* standard, not the *Strickland* standard.[8]   *Craig*, 847 S.W.2d at 435-36 (citing *Ex parte Duffy*, 607 S.W.2d 507, 514 n.14 (Tex. Crim. App. 1980) (explaining that the *Duffy* test for effectiveness of counsel in the punishment phase of a non-capital offense was, first, whether counsel was reasonably likely to render effective assistance, and second, whether counsel reasonably rendered effective assistance).   These facts alone distinguish *Craig* from the present case.   Nonetheless, in its original opinion, the El Paso Court had found that counsel's actions during the guilt-innocence stage were deficient when, among other things, counsel framed questions on cross-examination in a manner that accepted "a State-oriented interpretation of the circumstantial evidence and implications of the witness's testimony."[9]   *Id.* at 435 (citing *Craig v. State*, 783 S.W.2d 620, 625-26 (Tex. App.—El Paso 1989) *rev'd*, 825 S.W.2d 128 (Tex. Crim. App. 1992) (en banc)).   On remand, the court further concluded that "[g]iven these [eight] instances of deficient performance of counsel throughout the trial, [including the one noted above,] we are constrained to find that [Craig] did not receive reasonably effective assistance of counsel at the punishment stage of trial."   *Id.* at 435-36.   The *Craig* court reversed the

---

[8]   The Texas Court of Criminal Appeals noted that the El Paso Court of Appeals had found eight instances of deficient performance by trial counsel.   *Craig v. State*, 825 S.W.2d 128, 129 (Tex. Crim. App. 1992 (en banc).   The "immediate impression [of the court of criminal appeals] was that these deficiencies would necessitate reversal" of the entire case.   *Id.*   However, upon closer analysis, the court determined that Craig had not satisfied the prejudice prong of *Strickland*.   *Id.* (citing *Boyd v. State*, 811 S.W.2d 105, 109 (Tex. Crim. App. 1991) (en banc)) (providing that the *Strickland* test is the proper standard to gauge counsel's effectiveness at the guilt-innocence phase of a non-capital trial and at the guilt-innocence and punishment phases of a capital murder trial).

[9]   The *Craig* Court also found, in its original opinion, that this incident was not "attributable to colorable tactical decision."   *See id.* at 435 (citing *Craig*, 783 S.W.2d at 626).   Again, this distinguishes *Craig* because the findings of the trial court in this case, as set out below, suggest a strategic or tactical decision-making on the part of counsel regarding the use of "victim."

32

judgment and remanded for a new trial only on punishment. *Id.* at 436.

The *Doherty* Court determined that counsel's omissions, including his failure to call certain witnesses and to object on numerous legal grounds to the State's questions and to the admissibility of exhibits at the guilt-innocence stage, met both prongs of *Strickland*. 781 S.W.2d at 442. Concluding that counsel's ineffective assistance warranted remand for a new trial, the First Court of Appeals added the following:

> However, [counsel] did not stop there. Aside from his omissions, [counsel] himself made remarks prejudicial to appellant. [Counsel's] remarks to appellant, "you didn't take all the money?" and, "What did you do, hit him over the head first?" were heard 15-20 feet away. Fleming essentially admitted his client's guilt in the presence and hearing of the jury.
>
> We find that, considering the totality of [counsel's] representation of appellant, [counsel's] performance did not meet the standard of reasonably effective assistance of counsel.

*Id.*

Although both *Craig* and *Doherty* found multiple deficiencies in the respective counsel's performance, none of the deficiencies involved the use of the word "victim." Specific to Cueva's argument, Craig's counsel framed questions on cross-examination in a manner that accepted the State's interpretation of the evidence. *See Craig*, 847 S.W.2d at 435. Doherty's counsel asked him, with the jury nearby, if he took all the money and if he hit the victim over the head first. *See Doherty*, 781 S.W.2d at 441-42. Counsel's performance in each case arguably suggests a personal opinion that a crime occurred. We cannot conclude the same through Cueva's counsel's use of "victim" or through his failure to object to another's use of the word, as Cueva urges.

This conclusion is supported by the trial court's findings in this case. It found counsel's testimony regarding references to the complainant as "victim" credible;

33

specifically, that counsel did not object to the use of "victim" "because he did not believe it was practical to restrict the labels used to identify the parties in this manner" and "because he did not believe the references were harmful [to the defense], because jurors expected the use of such terms and were not influenced by their use." The trial court found that counsel's performance as it related to the use of the word "victim" was not deficient, and specifically, the court found that counsel's own use of the term was not deficient "in light of the fact that such terms are commonly used at trial in a neutral manner to describe the events in question and, in context, carry no implication that the person using such terms has an opinion one way or the other about the guilt of the defendant." The trial court further found that any deficient performance regarding use of the "victim" language "did not cause prejudice, and specifically that there is not a probability sufficient to undermine confidence in the outcome that, but for the complained-about deficiencies, the result of the proceeding would have been different."

We agree—because the term "victim" is relatively mild and non-prejudicial, especially given that courts have held invocation of far stronger terms did not amount to reversible error. *See Lopez v. State*, 162 Tex. Crim. 454, 286 S.W.2d 424, 425 (Tex. Crim. App. 1956) (holding that the use of the word "slaughter" did not cause injury to appellant); *Espalin v. State*, 90 Tex. Crim. 625, 237 S.W. 274, 279 (Tex. Crim. App. 1921) (concluding that the prosecutor's reference to appellant as "this killer" was not so prejudicial as to injure appellant's rights); *Jones v. State*, 900 S.W.2d 392, 397 (Tex. App.—San Antonio 1995, pet. ref'd) (deciding that the prosecutor's use of the term "sex slave" in regard to the complainant was not reversible error); *White v. State*, 699 S.W.2d 607, 615 (Tex. App.—Dallas 1985, pet. ref'd) (determining that the use of the word

34

"butcher" in reference to the appellant was not improper); *see also Byler v. State*, No. 03-01-00012-CR, 2002 Tex. App. LEXIS 1667, at *9-10 (Tex. App.—Austin Mar. 7, 2002, pet. ref'd) (mem. op., not designated for publication) (holding that counsel was not ineffective for failing to object to the State's characterization of complainant as "victim"). And appellate courts in Texas have even used the word "victim" in writing their opinions. *See, e.g., Villalon v. State*, 791 S.W.2d 130, 134 n.1 (Tex. Crim. App. 1990) (en banc) ("In this opinion the victim of appellant's sexual assault is referred to as the victim.").

Therefore, deferring to the trial court's findings of facts regarding the credibility and demeanor of the witnesses and viewing the evidence in the light most favorable to the trial judge's ruling, *see Gamboa*, 296 S.W.3d at 584, we conclude that the trial court's decision that counsel's actions were not deficient in this regard and that any deficiency was not prejudicial, was not an abuse of discretion. *See Charles*, 146 S.W.3d at 208; *see also Strickland*, 466 U.S. at 687. Cueva has not demonstrated that counsel performed "below an objective standard of reasonableness" on this basis. *See Ex parte Briggs*, 187 S.W.3d at 466.

### c. Testimony that Sexual Assault Occurred

Cueva also complains that references to where the crime occurred or the sexual assault took place and counsel's failure to object to the use of this language improperly communicated the opinions of the witnesses and counsel that Cueva was guilty. He asserts that counsel's purported strategic explanations were unsound and did not justify his eliciting or failing to object to references and opinion testimony that a sexual assault occurred; thus, this conduct constitutes deficient performance.

35

Cueva first complains of exchanges between counsel and Detective Eduardo Tagle that occurred over approximately sixty pages of trial transcript. Cueva directs this Court to ten times Detective Tagle made reference, without objection, to where the crime or sexual assault occurred. Furthermore, in response to counsel's question "Who took you in there and showed you these beds and told you this what you had been calling the scene where the sexual assault took place?", Detective Tagle responded, "Well, the mother explained to me which bed the sexual assault took place on and which bed he jumped over to."

Importantly, the trial court found credible counsel's "testimony that he did not object to testimony by the detective referring to the 'assault' because he did not perceive these references as suggesting that the assault or crime actually occurred and because jurors expect officers to testify in this manner." The trial court also found credible counsel's "testimony that his questioning of the detective referring to the location where the sexual assault occurred was designed to show that [A.G.'s] mother claimed something happened without actually seeing it." Thus, the trial court concluded that counsel "had a strategic reason for phrasing his questions in the way he did."

Cueva also directs us to the following exchange between counsel and Nurse McLaughlin, regarding her examination of A.G.:

Q.    So what is the point of the exam actually?

A.    The point of the exam is to find out from the child what happened, get her history, and to treat her medically so that she does not have an infection or something that needs to be treated.

Q.    And you also gather some evidence, correct?

A.    I gather evidence if it falls within the period of time that evidence collection is recommended, and I do it as a courtesy but nothing else.

Q.    Did it happen in this case?

A.    It did.

Q.    Because it fell within the 96 hour period, correct?

A.    Right.   Because I saw [A.G.] right after something had happened to her.

Q.    Is that the impression you got from … the mother of [A.G.], that she brought her there immediately after this happened?

A.    I had that the time of the incident on my chart was 8/5/07 at 2200 or 10 o'clock at night.

      …

Q.    On page 2 of 6, we have post-assault hygiene.   You have that page in front of you?

A.    Yes, I do.

      …

Q.    Post-assault hygiene which means after the assault happened?

A.    Before she saw me, yes.

Q.    In between the assault and seeing you –

A.    Correct.

Q.    – [A.G.] told you that she had wiped and washed herself?

A.    She had wiped.

As to this complained-of testimony, the trial court found credible counsel's "testimony that his question regarding what [A.G.] told the nurse 'after the assault took place' merely restated the victim's words and did not communicate [counsel's] own

37

opinion that an assault occurred." The trial court also generally found credible counsel's "testimony that his reference to the 'scene of the crime' did not communicate to the jury the belief that a crime actually occurred" and "that references to … the 'scene of the crime' during the course of a trial do not cause harm to the defense." Finally, the court found the counsel's failure to object to references by the prosecutor or the witnesses to "scene of the crime" and to statements suggesting that a crime occurred and his own use of the terms was not deficient performance "in light of the fact that such terms are commonly used at trial in a neutral manner to describe the events in question and, in context, carry no implication that the person using such terms has an opinion one way or the other about the guilt of the defendant."

Cueva also suggests that counsel was ineffective when he did not object to Detective Arturo Gonzalez's testimony, on direct examination by the State, that the absence of semen did not cause him to believe Cueva was innocent and, later, that he believed "there was a sexual act going on." However, with regard to Detective Gonzalez's first response, the State's initial question merely elicited his conclusion that the absence of semen on A.G.'s panties did not show that Cueva could not have committed the crime and, with regard to Detective Gonzalez's later response, that he believed there was a "sexual act going on," counsel did object, and the trial court sustained the objection.

Finally, Cueva directs us to the use of "after the assault took place" in the following question asked by counsel of A.G.'s mother during cross-examination: "You understand [A.G.] has told the nurse that she did all three of those things after the assault took place and before she was examined?" When the question is read in context, however, it is

38

apparent that counsel was attacking the credibility of the child by emphasizing inconsistencies between what A.G. told the nurse and what her mother believed happened, not that he was conceding a crime occurred, as argued by Cueva.

Again deferring to the trial court's findings of facts regarding the credibility and demeanor of the witnesses and viewing the evidence in the light most favorable to the trial judge's rulings, *see Gamboa*, 296 S.W.3d at 584, we conclude that the trial court's decision that counsel's actions in regard to the use or failure to object to the use of such complained-of language were not deficient was not an abuse of discretion. *See Charles*, 146 S.W.3d at 208; *see also Strickland*, 466 U.S. at 687. Cueva has not demonstrated that counsel performed "below an objective standard of reasonableness" on this basis. *See Ex parte Briggs*, 187 S.W.3d at 466.

### d. Testimony that A.G. Was Telling the Truth[10]

Cueva contends that his counsel was ineffective when he elicited testimony from three witnesses—A.G.'s mother, a nurse, and a counselor—that they believed A.G. was telling the truth about the allegations of sexual assault. He describes this testimony as prejudicial. Cueva asserts that counsel's strategic explanation for this conduct was incredible and did not justify his actions. We disagree.

A direct opinion on the truthfulness of the child, from either a lay witness or an expert witness, is inadmissible. *Yount v. State*, 872 S.W.2d 706, 708 (Tex. Crim. App. 1993) (en banc); *Sessums v. State*, 129 S.W.3d 242, 247 (Tex. App.—Texarkana 2004,

---

[10] In his motion for new trial, Cueva also complained that his trial counsel failed "to object to the prosecutor's argument that [Cueva] and his mother were lying" during the guilt-innocence stage of the trial. However, no findings were made regarding this claim, and Cueva does not make this argument on appeal.

pet. ref'd); *Fisher v. State*, 121 S.W.3d 38, 41-42 (Tex. App.—San Antonio 2003, pet. ref'd). Additionally, an expert may not offer an opinion that the class of persons to which the complainant belongs, such as child sexual abuse victims, is truthful or worthy of belief. *Pavlacka v. State*, 892 S.W.2d 897, 902 n.6 (Tex. Crim. App. 1994) (en banc); *Yount*, 872 S.W.2d at 712. This type of testimony is inadmissible because it does more than "assist the trier of fact to understand the evidence or to determine a fact in issue"; it decides an issue for the jury. *Yount*, 872 S.W.2d at 709. An expert may, however, testify to behaviors and traits that might constitute indicia of manipulation. *Schutz v. State*, 957 S.W.2d 52, 70 (Tex. Crim. App. 1997). For example, "[a] party may attack the credibility of a witness or other declarant by offering," among other things, "evidence that the person is, in general, the kind of person who is easily manipulated," *id.*, or an expert may offer "testimony that a child exhibits behavioral characteristics that have been empirically shown to be common among children who have been abused" because it "is relevant and admissible as substantive evidence under [r]ule 702." *Perez v. State*, 113 S.W.3d 819, 832 (Tex. App.—Austin 2003, pet. ref'd), *overruled on other grounds, Taylor v. State*, 268 S.W.3d 571, 587 (Tex. Crim. App. 2008).

### (i.) A.G.'s Mother

First, Cueva complains of the following testimony counsel elicited from A.G.'s mother on cross-examination:

Counsel:    Do you have any evidence to present to this jury that this incident was repeated on prior occasions?

…

40

Mother:     My daughter should be more than—she told me.  I believe her.  I walked in on it.  I don't know what other evidence you need.

After A.G.'s mother testified in this manner, counsel elicited testimony from A.G.'s mother that she believed everything her daughter told her.  Counsel then asked questions about inconsistencies between what A.G. told her mother and what A.G. told the nurse immediately after the incident.

As to this complaint, the trial court found "credible [counsel's] testimony [at the hearing on the motion for new trial] that it was his strategy to elicit testimony from [A.G.'s mother] that she believed [A.G.'s] accusations and that she always believed [A.G.], because it allowed [counsel] to contradict this by showing that [A.G.] lied about matters that occurred after the assault."  The court also found credible counsel's "testimony that [A.G.] could not have been truthful to both her mother and the nurse examiner because of conflicts in what she told the two witnesses, even though both witnesses were adamant that [A.G.] did not lie."  The trial court further found that counsel's actions were based on reasonable trial strategy to attack the credibility of A.G.'s mother and that deficient performance, if any, did not cause prejudice "in light of the fact that the opinion testimony was given by witnesses who had shown themselves to be biased against Cueva and thus, the witnesses could be expected to hold such opinions."  The trial court's finding of "no prejudice" is further supported by the line of cases that stand for the proposition that the admission of a mother's testimony regarding her child's character for truthfulness is harmless.  *See, i.e., Fisher*, 121 S.W.3d at 41 (holding any error in allowing an aunt and legal guardian to testify to complainant's character for truthfulness was harmless and stating, that "[a] jury would have expected … Alice's aunt and legal guardian who raised

Alice as her own child for six years prior to trial, to testify that Alice was truthful"); *In the Matter of G.M.P.*, 909 S.W.2d 198, 206 (Tex. App.—Houston [14th Dist.] 1995, no pet.) ("A jury would expect a mother to testify that her son was truthful, and would likely view such testimony with natural skepticism.").

### (ii.) Nurse Examiner McLaughlin

Cueva also complains of counsel's eliciting from McLaughlin, the sexual assault nurse examiner, that all five-year-old children tell her the truth. This question followed testimony by McLaughlin about A.G.'s examination. McLaughlin indicated, through her testimony, that it would not matter to her if the things A.G. told her about her "post-assault hygiene" were not true because she was five. When asked by counsel, "So when they are five it really does not matter to you whether or not what they are telling you is the truth?", McLaughlin testified that "[t]hey are usually pretty on about what they've done." After obtaining testimony regarding details of A.G.'s "post-assault hygiene," the following cross-examination occurred:

> Counsel:  Can a five year olds [sic] be manipulated?
>
> Nurse:  Can they be manipulated? Sometimes, sure. Everybody can.
>
> Counsel:  Do you know if [A.G.] is a five-year old subject to being manipulated?
>
> Nurse:  I think ever [sic] person is subject to being manipulated, sir, so yeah, she could be manipulated.
>
> Counsel:  And finally, do all five-year olds tell you the truth?
>
> Nurse:  Pretty much so, yeah.

McLaughlin's opinion testimony that A.G. is, in general, the kind of person who

42

could be manipulated was admissible.  *See Schutz*, 957 S.W.2d at 69-70; *Perez*, 113 S.W.3d at 832.  Counsel then asked McLaughlin if all five-year-old children tell her the truth.  He did not ask if five-year-old sexually-abused children—the specific class of persons to whom this complainant belongs—tell her the truth.  *See Pavlacka*, 892 S.W.2d 902 n.6; *Yount*, 872 S.W.2d at 712.  Still referring generally to the broad class of all five-year-old children, counsel asked, "Never had a five-year old tell you something that was not true?", to which McLaughlin answered,

> Most five-year olds would rather not tell me anything or tell me like it is.  Sure, I have had one or two lie to me in some way.  I am sure one of them would tell me that the blue monster came out of the closet.  I have had a couple do that.  I have had a five-year old tell me that somebody was an alien.  But in their mind, this was true to them.  I have had five-year olds lie to me but in that content, it would depend on the content.

Relevant to the foregoing, the trial court found credible counsel's "testimony that the reason he elicited testimony from the sexual assault nurse examiner that all five-year-olds generally tell her the truth" was "to demonstrate that her opinions were baseless, biased, and absurd."  The trial court found credible counsel's "testimony that during direct examination, the nurse indirectly conveyed her opinion that A.G. was telling the truth" and that counsel's elicitation of testimony from McLaughlin concerning her belief about the truthfulness of A.G. was based on reasonable trial strategy to attack her credibility.  It also found that any deficient performance in such elicitation did not cause prejudice "in light of the fact that the opinion testimony was given by witnesses who had shown themselves to be biased against Cueva and thus, the witnesses could be expected to hold such opinions."

43

### (iii.) Counselor Ramos

Finally, Cueva challenges counsel's cross-examination of Dennis Ramos, a licensed professional counselor, who testified that he knew he was going to testify at Cueva's trial only one day before he did so and that he was not briefed on the case by the prosecutor until the day he testified.[11] Cueva complains of counsel's actions when he elicited testimony from Ramos that, in his experience, it is "very rare that a child will lie about sexual abuse" and that he had "never seen a younger child lie about being abused." This testimony occurred during the following cross-examination of Ramos about his case load and the criteria or methodology he uses:

Counsel: How do you get those cases [you are maintaining at this time]?

Ramos: All different places.… The children that are actually abused that are referred to me are either brought in by their parents or they are refereed to me by an agency ….

Counsel: Now when you say "actually abused," how is that determination made, that actual abuse has taken place?

Ramos: By the report of the child and also by medical exam.

Counsel: Okay. So we have either the child saying, I was sexually abused, or some kind of medical examination's finding and making an affirmative finding of sexual abuse?

Ramos: Or both.

Counsel: Now, in your opinion, if a child says they are sexually abused, is [sic] there any questions in your mind that the said abuse has taken place?

---

[11] Ramos explained that he was told "[t]here was a five-year old victim and that the accused was discovered by the mother." He was not told what specifically was discovered, and he had not talked with A.G. or her mother. Ramos testified that he was "not forming an opinion about the guilt or innocence about this—this case. [He was] merely providing [his] experience about … the validity of—of abuse victims and the behaviors of perpetrators that [he knew] from [his] experience."

44

Ramos: I evaluate that, but my experience is that it's very rare that a child will lie about those things.

Counsel: Have you never met a child who has lied about being sexually abused?

Ramos: I have met probably two, and they were older children, 14 or 15 years old.

Counsel: How do you determine that they have lied about their sexual abuse[?]

….

Ramos: The only way that I know to determine that is if they admit that they have lied.

Counsel: So unless the child admits that he has lied about it, we're going to take at face value the child has been sexually abused—

Ramos: I—

Counsel: By the fact that they said that?

Ramos: I generally evaluate the possibility of lying. It has been very rare that I have seen children lie about being abused, especially in—I have never seen a younger child lie about being abused.

Then, through the series of questions and answers set out below, counsel challenged Ramos's method of determining whether a child is sexually abused which, as described by counsel, is based on "subjective" criteria. In this same exchange, counsel also elicited testimony from Ramos that he agreed medical professionals also take the child's claims at "face value" and believed this was a "valid measure" of the child's truthfulness:

Counsel: Well, I mean that's because you have already determined the criteria for that is admitting that they have lied.

45

What you're telling us is that you've never had a younger child who has claimed that they have been sexually abused later admit that they weren't sexually abused; is that right?

Ramos: That's correct.

Counsel: You have never been able to actually objectively determine whether or not any of these children have actually lied about it. Correct?

Ramos: I have been able to establish when they told the truth, when there's other evidence. But as far as—

Counsel: What percentage of cases have additional evidence, objective evidence that you can look at besides the subjective complaint of sexual abuse, in your practice?

Ramos: I would say at least half have other corroborating evidence, either a witness or medical—medical documentation about the abuse.

Counsel: Okay. How many have had a witness?

Ramos: Probably about 20 percent.

Counsel: Twenty percent witnesses come forward and say, Yes, I watched sexual abuse take place?

Ramos: Or I discovered it or another child witnessed it, yes.

Counsel: Okay. Then what about the medical side of it? What do you usually regard as medical evidence of child abuse?

Ramos: I take at face value what the nurses' and doctors' report say, If they—

Counsel: Such as the doctors' reports provided by the sexual assault nurse examines?

Ramos: Yes.

Counsel: Now, have you ever spoken with a sexual assault nurse—a sexual assault nurse examiner about what criteria they look at in determining whether or not sexual abuse has taken place?

46

Ramos:      Yes.

Counsel:    Do you realize that the same criteria that you employ is the same criteria that they employ; that if, in fact, a child reports a history of sexual abuse, they take that at face value?

Ramos:      That makes sense to me.  That does sound like a valid measure.

Counsel:    Do you not see a problem with the circular nature of that, that because a sexual assault nurse examiner said that the historian reports it; and, therefore, I take it as face value, we now have a report that you consider could corroboration, when, in fact, it's nothing more than what you've already heard?

Ramos:      Well, I was speaking of physical evidence.

In its findings, the trial court found credible counsel's testimony that the reason he elicited the complained-of testimony from Ramos was "to demonstrate the absurdity of this premise, attack his credibility, and show that he was biased in favor of the State, in view of the fact that counsel had not interviewed [A.G.] and was not familiar with the present case."   The trial court further found credible counsel's "testimony that it was his strategy to show that the psychologist believed any child who did not later admit to lying and that it was absurd for a [counselor] who had never interviewed the [complainant] to render an opinion that children always tell the truth."   The trial court also found, as it did for A.G.'s mother and the nurse examiner, that counsel's elicitation of testimony from Ramos concerning his belief about the truthfulness of children was based on reasonable trial strategy to attack his credibility and that any deficient performance in such elicitation did not cause prejudice "in light of the fact that the opinion testimony was given by witnesses who had shown themselves to be biased against Cueva and thus, the

47

witnesses could be expected to hold such opinions."

Therefore, deferring to the trial court's findings of facts regarding the credibility and demeanor of A.G.'s mother, McLaughlin, and Ramos, and viewing the evidence in the light most favorable to the trial judge's rulings, *see Gamboa*, 296 S.W.3d at 584, we, too, conclude that the trial court's decision that counsel's actions in this regard were the result of reasonable trial strategy, *see Jaynes*, 216 S.W.3d at 851, and any deficiency in his actions was not prejudicial. *See Charles*, 146 S.W.3d at 208; *see also Strickland*, 466 U.S. at 687. Cueva has, therefore, not demonstrated ineffective assistance of counsel on this basis. *See Ex parte Briggs*, 187 S.W.3d at 466.

### e. Testimony that Cueva Threatened A.G.'s Mother

Cueva contends that counsel was also ineffective when he elicited testimony from A.G.'s mother that A.G. said Cueva threatened to hurt her mother if A.G. told anyone what he did to her.[12] Specifically, Cueva's trial counsel asked A.G.'s mother, "Did you ask [A.G.] what happened?," and A.G.'s mother replied that A.G. told her that it was not the first time and she did not tell her mother because Cueva said he "would hurt mommy if [A.G.]" told her. Cueva asserts that this testimony was inadmissible hearsay because (1) counsel did not request, and the trial court did not conduct, a mandatory article 38.072

---

[12] Cueva recognizes that the State gave pre-trial notice that it intended to introduce outcry statements made by A.G. through testimony from her mother, McLaughlin, and Ricardo Jiminez, a counselor. Cueva's trial counsel successfully objected to Jiminez testifying about statements made by A.G. on the basis that he was not a proper outcry witness. Therefore, we have nothing to review regarding Jiminez's testimony.

In addition to complaining about testimony related to the alleged threats and the reason for A.G.'s silence, Cueva complains, for the first time on appeal, about counsel's failure to object to additional inadmissible hearsay testimony provided by A.G.'s mother and McLaughlin. Therefore, these additional complaints should be addressed under the *Strickland* standard. However, because the record is insufficiently developed to support this complaint of ineffective assistance, we need not address it further. *See Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003).

48

hearing, *see* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2 (West Supp. 2010); (2) A.G.'s mother was not a proper outcry witness because she and McLaughlin testified concerning A.G.'s statements about the same events, *see Broderick v. State*, 35 S.W.3d 67, 73 (Tex. App.—Texarkana 2000, pet. ref'd) (explaining that testimony from more than one outcry witness is inadmissible under article 38.072 where the witnesses repeat the same events as related to them by the complainant); and (3) the testimony was not about an outcry statement because it did not describe the alleged offense. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2 (providing, inter alia, that "[t]his article applies only to statements that describe the alleged offense"); *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990) (en banc) (setting out, to be admissible, an outcry statement must describe the alleged offense in some discernible manner).

Assuming without deciding that the statements were inadmissible for any one of the three reasons set out by Cueva, we nonetheless conclude that counsel's action in eliciting the response and not objecting that it was non-responsive testimony was not ineffective assistance. This testimony occurred on cross-examination of A.G.'s mother after counsel asked her if she had asked A.G. what happened. Rather than giving a "yes" or "no" response, A.G.'s mother began recounting what A.G. had told her about the incident, that it was not the first time, and why she had not said something earlier. Instead of objecting, Cueva's counsel used this testimony against A.G.'s mother, as inconsistent with her prior statement to the police. As Cueva acknowledges, A.G.'s mother admitted she did not include these statements in her written statement to the police. She testified that, instead, she told the police and A.G.'s psychologist that A.G. told her this.

49

Following the motion for new trial hearing, the trial court found credible counsel's "testimony that he was able to impeach [A.G.'s] mother with her non-responsive testimony by showing that the mother had not previously made these claims in the statement given to the police."   The trial court further found credible counsel's "testimony that it was his strategy to point out the mother's inconsistent testimony and that she was changing things she said in her prior testimony," and that "this was a reasonable trial strategy in light of the fact that the mother's credibility was a key factor at trial."   The court then found that counsel's actions were not ineffective and not prejudicial.

Deferring to the trial court's findings of facts regarding the credibility and demeanor of the witnesses and viewing the evidence in the light most favorable to the trial judge's rulings, *see Gamboa*, 296 S.W.3d at 584, we also conclude that the trial court's decision that counsel's actions in this regard were not deficient and, even if they were deficient, they were not prejudicial, was not an abuse of discretion.   *See Charles*, 146 S.W.3d at 208; *see also Strickland*, 466 U.S. at 687.   Cueva has not demonstrated that counsel performed "below an objective standard of reasonableness" or that he was prejudiced by counsel's deficiency, if any, on this basis.   *See Ex parte Briggs*, 187 S.W.3d at 466.

### f.   Testimony About Sexual Assaults of Small Children

Cueva next asserts that testimony provided by McLaughlin—testimony Cueva describes as explaining "how most rapists sexually assault small children"—was non-responsive, irrelevant under rule of evidence 401, and even if relevant, unduly prejudicial under rule of evidence 403.   He claims that counsel's failure to object to this testimony constituted deficient performance.

50

On direct examination, the State asked McLaughlin if, when she performed her examinations, she expected to find genital trauma in the area of the female sexual organ,[13] even if a sexual assault had just occurred. In response, McLaughlin testified that "80 percent of the time [she] does not find injuries" although she looks for injuries, "they are not there." The State then asked McLaughlin to "explain how the hymen is not injured through sexual assault," and McLaughlin provided the following testimony:

> Sexual assault can happen a lot of ways like I said. With small children, when people are trying to touch small children, their aim is not to hurt them because if you hurt them, they are going to tell. So you don't want to hurt them or they are going to go running off and tell. We have found with smaller children, the anus is used a lot because it is a lot more flexible and with proper lubrication and moistness, it can be very slippery and non-painful for the child. With the female sexual organ, when you hit the hymen of a child that hasn't started her period yet, it is a painful thing. It hurts. So most people that try to do sexual acts on small children will do them between the lips and more like rub between the lips and back towards the back, kind of like a hot dog bun upside down, rubbing between the lips. Because if they go in, they are going to hit that painful area and they don't want to cause pain because then the kid is going to cry or runaway or tell.

Cueva's trial counsel did not object, and the State continued, "So when you examined A.G. …, what did you see?" In response, McLaughlin testified about what she found when she examined A.G., specifically that there was red erythema or skin breakdown throughout A.G.'s "private area." She also testified as to how the hymen is not injured through sexual assault. McLaughlin explained that the reason a sexual offender would commit the offense in the manner alleged in this case was to avoid causing physical pain to the child and to decrease the possibility that the child will "cry or

---

[13] McLaughlin described the "female sexual organ" as including the labia, the vagina, where the hymen is located, and the cervix.

run away or tell."

At the motion for new trial hearing, when asked if counsel believed "it is admissible for an expert witness to testify [about] what most offenders do?", counsel responded, "Not in that context." Counsel explained that "[he] did not feel that that [testimony] was particularly objectionable at the time," and that it did not fall into the category of "what most sex offenders do." According to counsel, his "appreciation of [McLaughlin's] answer to that question was that it fell into the parameters of what the prosecutor asked her and [he believed] it was a proper question." Counsel continued testifying that "how most sex offenders commit their offense" was not the question asked. Rather, according to counsel, "[t]he question was why—had to do with the hymen and [McLaughlin] expanded on the answer somewhat to included [sic] some things in there—" that he agreed were not responsive to the question. When asked why he did not object to the non-responsive testimony, counsel stated that he did not want to be objecting unnecessarily and that he "just did not think it was particularly harmful at that point in time." Cueva's counsel then asked, "Assuming for the sake of argument that the prosecutor's question was appropriate, you do agree that the statement of how most people commit child sex offense [sic] was improper opinion or irrelevant at that point?", and counsel answered, "At the very least irrelevant and possibly even improper opinion."

Following the hearing, the trial court found that counsel's "failure to object to testimony explaining the modus operandi of a typical sex offender" was not deficient performance. Specifically, the trial court found credible counsel's "testimony that he did not object to testimony from [McLaughlin] concerning the medical reason most sex offenders perform the type of assault they do on small children because he did not believe

52

this testimony was harmful." The court also found that any deficient performance did not cause prejudice "in light of the fact that the testimony provided the jury with explanations that it could have drawn from common sense and logical inferences."

Viewing the evidence in the light most favorable to the trial judge's rulings, we again defer to the trial court's findings of facts regarding the credibility and demeanor of the witnesses, *see Gamboa*, 296 S.W.3d at 584, and conclude that the trial court's decision that counsel's actions in this regard were not deficient and, even if they were deficient, his actions were not prejudicial, was not an abuse of discretion. *See Charles*, 146 S.W.3d at 208; *see also Strickland*, 466 U.S. at 687. Cueva has not demonstrated that counsel performed "below an objective standard of reasonableness" or that he was prejudiced by counsel's deficiency, if any, on this basis. *See Ex parte Briggs*, 187 S.W.3d at 466.

### g. Testimony by A.G.'s Mother that Cueva Assaulted Her

Cueva complains that counsel's performance was deficient when he failed to preserve error by requesting an instruction to disregard or by moving for a mistrial after the trial court sustained his objection to A.G.'s mother's testimony about a previous assault.[14] Cueva asserts that counsel's failure to preserve error was unintentional, not strategic—that no sound trial strategy justified counsel's conduct.

On re-cross examination by Cueva's trial counsel, A.G.'s mother provided the following testimony:

---

[14] Cueva also complains that counsel's performance was deficient when he allegedly opened the door to, elicited, and failed to object to testimony provided by A.G. that Cueva kicked and pushed her mother. These allegations were not raised in Cueva's motion for new trial and will, therefore, be addressed later in this opinion.

Q. [Counsel]        You believed [A.G.] when she told you that [Cueva] had told her not to tell anybody because he would hurt you?

A. [A.G.'s Mother]  Yes, because he had before.

Q.                  You believed her when she said that?

A.                  She's known what he has done to me.

Later, on re-direct examination, the prosecutor made the following comment to A..G.'s mother: "You mentioned when he asked about why she was afraid that he would hurt you. [sic] You said that she's known what he has done to me." Outside the presence of the jury, counsel successfully objected to this line of questioning when the trial court ruled that counsel had not opened the door to testimony regarding a previous assault against A.G.'s mother with his earlier questioning. Although the trial court sustained his objection, counsel did not request an instruction to disregard and did not move for a mistrial.

Cueva relies on *Robertson v. State* for his contention that no sound trial strategy justified counsel's failure to preserve error. *See* 187 S.W.3d at 484. In *Robertson,* the court of criminal appeals concluded "that appellant's trial lawyer performed deficiently under the first prong of *Strickland* for eliciting testimony from appellant at the guilt stage of his trial that appellant was already incarcerated on two convictions that were pending on appeal." *Id.* at 486. The court reasoned as following:

> [I]n cases like this where appellant's self-defense claim rested almost entirely on his credibility, the weight of authority supports a holding that appellant's trial lawyer performed deficiently under the first prong of *Strickland* by allowing the jury to hear prejudicial and clearly inadmissible evidence [regarding two prior convictions] because this evidence could serve no strategic value including demonstrating that appellant is not a liar.

54

*Id.* (citations omitted). While *Robertson* provides general propositions of law regarding the admission of extraneous acts testimony and character evidence, we do not agree that *Robertson* supports a conclusion that there was no sound trial strategy that would justify counsel's conduct in this case.

Based on our review of the record, counsel may have strategically decided not to request an instruction to disregard or a mistrial. After A.G.'s mother provided testimony on re-cross suggesting that Cueva hurt her on a prior occasion, Cueva's counsel immediately directed the jury's attention to the witness and attempted to impeach her testimony about A.G.'s truthfulness by asking, "You never saw any indication of fear with [A.G.] whenever you left her with him?", to which she responded, "No." Counsel then asked if A.G. had come up to her and tried to tell her anything. A.G.'s mother again responded, "No." Also, the prosecutor's comment about what Cueva had done to A.G.'s mother, although objected to, was heard by the jury and arguably supported a strategy to show her bias against Cueva. Finally, counsel may have had a legitimate belief that requesting further relief would have only highlighted the objectionable testimony. *See Garcia v. State*, 887 S.W.2d 862, 881 (Tex. Crim. App. 1994) (en banc), *overruled on other grounds, Hammock v. State*, 46 S.W.3d 889, 893 (Tex. Crim. App. 2001).

The trial court found that counsel's "failure to ask for an instruction to disregard or a mistrial regarding improper testimony by [A.G's] mother about an extraneous assault" was deficient performance. The trial court also found no prejudice, setting out the following finding:

> However, the [c]ourt finds that any deficient performance did not cause prejudice, and specifically that there is not a probability sufficient to undermine confidence in the outcome that, but for his failure, the result of

55

the proceeding would have been different, in light of the fact that similar testimony had been elicited elsewhere and was consistent with [counsel's] strategy to show that [A.G.'s] mother and grandmother were biased against Cueva to the point that they compelled [A.G.] to fabricate the present charges.[15]

As discussed above, the record supports a finding that counsel made strategic decisions regarding this testimony. While decisions rooted in strategy typically do not constitute deficient performance, *Strickland*, 466 U.S. at 689, we defer to the trial court's finding of deficient performance in this instance because, affording deference to the trial court's underlying historical fact determinations, *see Escobar*, 227 S.W.3d 127, we agree that the error, if any, was not prejudicial. Similar testimony had been elicited elsewhere, and counsel's actions were consistent with his trial strategy to show bias, a strategy that should have been apparent to the jury throughout the trial. Therefore, there was not a probability sufficient to undermine confidence in the outcome that, but for counsel's failure to ask for an instruction or a mistrial, the result of the proceeding would have been different. *See Smith*, 296 S.W.3d at 340. Therefore, counsel's error was not so serious as to deprive Cueva of a fair trial. *See id.*

### h. Cueva Expressed Interest in Having Anal Sex with A.G.'s Mother

Cueva contends that counsel also performed deficiently when he did not object to testimony from A.G.'s mother that Cueva expressed an interest in having anal sex with her, i.e., testimony regarding extraneous conduct. *See Lopez v. State*, 288 S.W.3d 148, 164 (Tex. App.—Corpus Christi 2009, pet. ref'd). Cueva asserts that this testimony was

---

[15] Cueva testified that he told Detective Gonzalez that he did not do anything to A.G., that A.G.'s grandmother did not like him and was mad when Cueva, A.G.'s mother, and A.G. moved to Robstown, and that A.G.'s mother fabricated her story about what she saw in the bedroom. Cueva presented a fabrication defense and argued that A.G. was improperly influenced.

irrelevant to the issue of whether he anally assaulted A.G.   *See* TEX. R. EVID. 402, 404; *Casey v.* State, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).   Cueva further argues that, with this testimony, the State portrayed him as a sexual deviant, encouraging the jury to believe that he anally assaulted A.G. because he had expressed interest in having anal sex with A.G.'s mother.   We construe this last complaint as a rule 403 argument—that, even if the evidence is relevant, its prejudicial nature far outweighs the relevance of Cueva having anal sex with A.G.'s mother.   *See* TEX. R. EVID. 403; *Casey*, 215 S.W.3d at 879.

At trial, during direct examination, A.G.'s mother agreed that Cueva had expressed an interest in anal sex, which she did not want to do.   When asked if she and Cueva engaged in anal sex, A.G.'s mother answered, "I want to say we tried it about twice."

In support of his argument, Cueva cites to *Fox v. State*, *Brown v. State,* and *Doles v. State*.   *See Fox*, 283 S.W.3d 85, 93-96 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd); *Brown*, 974 S.W.2d 289, 293-94 (Tex. App.—San Antonio 1998, pet. ref'd) (op. on reh'g); *Doles*, 786 S.W.2d 741, 746 (Tex. App.—Tyler 1989, no pet.).   Each case, however, is distinguishable from the present case because each involves a counsel's reoccurring failure to object to numerous instances of irrelevant testimony involving, for example, homosexual experiences, promiscuity, and instability in the family–-numerous extraneous and prejudicial matters which had a substantial and injurious effect on the verdict.   *See Fox*, 283 S.W.3d at 93-96; *Brown*, 974 S.W.2d at 293-94; *Doles*, 786 S.W.2d at 746.   Cueva, in contrast, complains of one instance of testimony involving what is arguably irrelevant and inadmissible evidence.

57

Furthermore, at the hearing on Cueva's motion for new trial, counsel provided the following testimony responsive to questions about Cueva engaging in anal sex with A.G.'s mother:

Q. You did [not] object to any of that testimony did you, sir?

A. No.

Q. How was testimony that Mr. Cueva had expressed an interest in consensual anal sex with his adult sexual partner relevant to whether he committed the offense of aggravated sexual assault of a child with A.G.?

A. It probably was not particularly relevant but I knew where the prosecutor was going with it and expected that it would be allowed because of the context of what she claims she had seen in the room.

Q. So even though you recognize it probably was not relevant, you did not object because you assume the court would overrule the objection?

A. I had strategic reasons for discussing that and I knew I was going to discuss that with her as well.

Q. Please articulate those strategic reasons.

A. They had been together in that room for a couple of weeks prior to the incident taking place. Mr. Cueva had explained to me that he and [A.G.'s mother] had engaged in anal sex in that room, and it was my theory that in all probability [A.G.] had observed this taking place and she was relating what had taken place to her or she had seen taken place between her mother and Charles rather than anything that had actually taken place with her. I think I told you that when we talked on the phone the other day.

Q. So you made the argument to the jury that A.G. was simply outcrying about things that she had observed and not things that had really happened to her?

A. Yeah, I don't remember. Obviously, if you are asking the question, I probably did not argue that to the jury.

58

Q.    Isn't it true that when we spoke on the telephone and I asked you whether you intended for the jury to hear that Charles had expressed an interest in anal sex with [A.G.'s mother], you said that was not strategic?

A.    It was not strategic that he had expressed the interest but that they had engaged in it.   I was not interested in the jury hearing that he had an interest in anal sex, no.

Q.    And he denied that he had anal sex, correct?

A.    During his cross-examination or—

Q.    Let me just stick with what we spoke about.   I asked you, is it fair to say that that's not something that you intended for the jury to hear, meaning the testimony regarding—

A.    His interests in anal sex, yes.

Q.    And you said that was not strategic?

A.    That's correct.

Q.    Then didn't you tell me once that evidence came in, you reacted to it and dealt with it the best that you could?

A.    Yeah.   That's also true.

Q.    But you would have rather it not come in at all because then you would not had to deal with it.   Fair to say?

A.    Yeah.

A defense counsel's failure to object to certain improper evidence is not by itself an indication of ineffective assistance of counsel.   *Long v. State*, 502 S.W.2d 139, 141 (Tex. Crim. App. 1973).   "Counsel does not render ineffective assistance because he used what another would consider a poor trial strategy."   *Id.*   In this case, counsel may not have objected to the complained-of testimony in an effort to provide an alternate explanation for A.G.'s allegations—that A.G. was relating what she had seen taken place

59

between her mother and Cueva rather than anything that had actually taken place with her. This is supported by counsel's cross-examination of A.G.'s mother where he elicited testimony from her that she and Cueva had been sexually active at times when the children were there, implying that A.G. may have learned from this some of the things that she told the psychologist that were not appropriate for a five-year-old to know.

Moreover, the trial court found counsel's testimony credible regarding his failure to object to the testimony in question from A.G's mother because it was his strategy to show that A.G. was relating what she had seen take place between Cueva and her mother, rather than what Cueva had done to her. The court found that this was reasonable trial strategy and that counsel's failure to object was not deficient, and if it was, it did not cause prejudice in light of the fact that the acts in question are legal and not uncommon between consenting adults.

Therefore, deferring to the trial court's findings of facts regarding the credibility and demeanor of the witnesses and viewing the evidence in the appropriate light, *see Gamboa*, 296 S.W.3d at 584, we again conclude that the trial court's decision that counsel's actions were not deficient and, even if they were deficient, they were not prejudicial, was not an abuse of discretion on this ground. *See Charles*, 146 S.W.3d at 208; *see also Strickland*, 466 U.S. at 687. Cueva has not demonstrated that counsel performed "below an objective standard of reasonableness" or that he was prejudiced by counsel's deficiency, if any, on this basis. *See Ex parte Briggs*, 187 S.W.3d at 466.

### i. Jury Charges

Finally, through his motion for new trial, Cueva challenged counsel's failure to object to the guilt-innocence charge on the basis that Cueva was allegedly convicted on a

non-unanimous vote. He also asserts that counsel's failure to object to an instruction in the punishment charge which improperly instructed the jury on how to calculate his parole eligibility was deficient performance and, thus, harmed him.

### (i.) Guilt-Innocence Charge

On appeal, Cueva first contends that because counsel did not object to the guilt-innocence jury charge which Cueva claims improperly authorized conviction in Count 4 on a non-unanimous verdict, his performance was deficient. Having concluded, in the first issue, that no charge error existed that violated Cueva's right to unanimity in his verdict in Count 4, we now conclude that counsel's failure to object to the charge was not deficient performance. This is supported by the following motion for new trial findings: (1) counsel's "failure to object that the jury charge regarding Count 4,[16] improperly authorized conviction on a non-unanimous verdict" was not deficient; and (2) even if counsel's non-action was deficient, it did not cause prejudice "in light of the fact that penetration subsumes the act of contact and there is no dispute that the evidence presented that [A.G.], if penetrated, was also contacted by Cueva's sexual organ."

### (ii.) Punishment Charge

Cueva also complains that counsel's failure to object to a portion of the punishment charge that erroneously instructed the jury on how Cueva's parole eligibility would be calculated constituted deficient performance. He further contends that counsel's failure to object prejudiced him because the erroneous parole charge allowed the jury to grossly

---

[16] At the motion for new trial hearing the parties agreed and the trial court acknowledged that although the motion referred to Count 6, it should be correctly referred to as Count 4, and we will do likewise.

miscalculate his parole eligibility to his detriment.[17]

At the hearing on the motion for new trial, counsel testified that his failure to object was inadvertent. Agreeing that it was "a harmful [c]harge," counsel testified that he "read that portion, but the way it was phrased escaped [him] at the time." He also agreed that if he had "caught it," he would have brought it to the court's attention." When asked who prepared the punishment charge, he responded as follows: "They are usually prepared by the D.A.'s office and then provided to the court. I can't say for certain that that is what took place in this case. Sometimes the court manager has a Charge that is used. That's typically how it is done."

As set out in its findings of fact, the trial court found credible counsel's "testimony that he inadvertently failed to object to that portion of the punishment charge which incorrectly instructed the jury on good[-]conduct time," and that this conduct was not deficient. The trial court further found that error, if any, regarding the application of good conduct time did not cause prejudice "in light of the fact that the charge instructed the jurors that they were not to consider how good[-]conduct time and the parole law might be applied to Cueva, neither party argued the concept of good[-]conduct time or how it might be considered in evaluating parole eligibility …, and the nature of the offenses warranted lengthy sentences."

Again, deferring to the trial court's findings of facts regarding the credibility and demeanor of the witnesses and viewing the evidence in the light most favorable to the trial

---

[17] We overruled Cueva's second issue, concluding that although the trial court erred when it included "plus any good conduct time earned" in the third paragraph of its parole instruction, there was no egregious harm. *See Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005) (explaining that when no objection is made to what is determined to be charge error, we may reverse only if the record shows egregious harm).

judge's rulings, *see Gamboa*, 296 S.W.3d at 584, we conclude that the trial court's decision that counsel's actions regarding the alleged charge error at the guilt-innocence stage and the alleged charge error at the punishment stage were not deficient, and even if they were deficient, they were not prejudicial, was not an abuse of discretion. *See Charles*, 146 S.W.3d at 208; *see also Strickland*, 466 U.S. at 687; *see also Robertson*, 187 S.W.3d at 483 (explaining that one is ensured the right to reasonably effective assistance of counsel, not perfect assistance). Cueva has not demonstrated that counsel performed "below an objective standard of reasonableness" or that he was prejudiced by counsel's deficiency, if any, on this basis. *See Ex parte Briggs*, 187 S.W.3d at 466.

## 2. Additional Claims

In his third and fourth issues, Cueva asserts additional claims of ineffective assistance of counsel that were raised either (1) for the first time at the motion for new trial hearing and objected to by the State, or (2) for the first time on appeal. We will apply the *Strickland* standard of review to these claims and will not review the additional claims through the prism of a motion for new trial standard. *Gill*, 967 S.W.2d at 542.

### a. Guilt-Innocence Stage

#### (i.) Oral Statements

Cueva argues counsel's assistance was ineffective because he did not object to testimony from Detective Gonzalez, the interrogating officer, regarding oral statements Cueva made while being questioned.[18]  These oral statements, however, were similar to,

_____

[18] Gonzalez testified that Cueva told him that he did not know why he "did it," but that it was probably because he had been molested as a child.   Gonzalez stated that Cueva told him that he was sorry

if not the same as, admissions made by Cueva in his written statement, admitted at trial as State's Exhibit #3. The failure to object to cumulative evidence is harmless and will not support a claim of ineffective assistance of counsel. *See Ingham v. State*, 679 S.W.2d 503, 508 (Tex. Crim. App. 1984) (en banc); *Duhart v. State*, 890 S.W.2d 187, 190 (Tex. App.—Corpus Christi 1994, no pet.).

Counsel could also have made a reasonable decision to allow the statements into evidence, along with the circumstances under which they were made, in order to challenge the credibility of the police and, by extension, the credibility of all those responsible for gathering and presenting evidence against him. Under the circumstances and affording great deference to counsel's ability, we cannot conclude that it was not sound and reasonable strategy on the part of counsel to decide to not object to testimony regarding Cueva's oral statements in order to show how the investigation had been mishandled. *See Jaynes*, 216 S.W.3d at 851. Therefore, we conclude that counsel did not perform "below an objective standard of reasonableness" in this regard, and counsel's decision to not object to this testimony was not deficient. *See Ex parte Briggs*, 187 S.W.3d at 466.

### (ii.) Cueva Minimized His Conduct in His Written Statement

Cueva also contends that his trial counsel was ineffective for failing to object to the following questions asked of Detective Gonzalez by the State:

Q. Have you found that defendants will sometimes minimize what they did?

---

for what he did; he did not penetrate A.G.; he touched her more than ten times over a three-year period; he touched her "butt," got aroused, and kissed her lips; and he once let her touch his penis. Similar statements are found in Cueva's written statement.

64

A.   Yes, they do.

Q.   Did you see that in this case?

A.   Yes, I did.

Q.   How?

A.   As far as him saying, Oh, I just touched her.   After the victim outcried to her mother, saying that she was penetrated, he minimized it, saying, No, all I did was touch her.   I never penetrated her.   I just let her touch me.   That's minimizing the situation.

Cueva asserts that, from this testimony, one could infer that Cueva was not telling the truth, and thus Detective Gonzalez's testimony would have been inadmissible, over timely objection, under rules of evidence 701 and 702.   We disagree.

Police officers may generally offer lay-opinion testimony concerning matters about which they have personal knowledge and experience in their employment as a law enforcement officer and specifically concerning the meaning of certain behavior of criminal suspects they encounter.   *See Fairow v.* State, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997) (en banc).   The responses elicited from Detective Gonzalez do not involve a direct opinion that Cueva lied in his statement or that Cueva was guilty of the offense. Rather, Detective Gonzalez testified to the facts he observed—that Cueva admitted he touched the child but did not penetrate her and that he let her touch him.   Detective Gonzalez explained that a defendant will do this in an attempt to "minimize the situation." For this reason, we cannot conclude that Cueva has demonstrated that counsel performed below an objective standard of reasonableness when he did not object to this testimony.   *See Ex parte Briggs*, 187 S.W.3d at 466.

65

### (iii.) Victim-Impact Testimony

Cueva argues that counsel's performance was also deficient when he did not object to testimony elicited by the State from A.G.'s mother that, because of the incident, she gave up a job in a "high school to shadow a special ed student," a job for which she had just been hired, and that she "gave up everything" including a wedding and a job. Cueva contends that this victim-impact testimony was improper at the guilt-innocence stage and that counsel had no sound strategic reason for not objecting.

In support of his argument, Cueva cites *Miller-El v. State.* 782 S.W.2d 892, 895 (Tex. Crim. App. 1990) (en banc). Concluding that victim-impact testimony did not have "any tendency to make more or less probable the existence of any fact of consequence at the guilt stage of trial," the *Miller-El* Court suggested that if victim-impact testimony was relevant to any guilt issue, it would be admissible at the guilt stage of trial. *Id.* (citing TEX. R. EVID. 401) (defining "relevant evidence" as evidence having any tendency to make the existence of a fact of consequence more or less probable); *Longoria v. State*, 148 S.W.3d 657, 659-60 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (concluding that victim impact testimony is admissible at the guilt-innocence stage as a "circumstance of the offense").

The State asserts, and we agree, that, in this case, the mother's testimony regarding the impact of the crime on her was relevant. Cueva made it relevant as rebuttal to his defense that A.G.'s mother manipulated A.G. to fabricate the assault so that they could get back into the good graces of her family. Based on the testimony that she lost both her wedding plans and her new job, A.G.'s mother would not be gaining anything by manipulating A.G. to make these charges. Therefore, evidence of the impact of the

incident on A.G's mother, although typically irrelevant, did, in this case, have a tendency to make more or less probable a fact of consequence at the guilt stage; that is, whether Cueva committed the crime at all. *See Miller-El*, 782 S.W.2d at 895. Since this testimony would have been admissible on that basis, we cannot say that Cueva's trial counsel's failure to object to the testimony fell below the objective standard of professional norms. *See Ex parte Briggs*, 187 S.W.3d at 466.

### (iv.)  Testimony that Cueva Assaulted A.G.'s Mother

For the first time on appeal, Cueva complains of counsel's failure to object to testimony provided by A.G on cross-examination, testimony which Cueva alleges concerned a prior assault.[19] He claims that his trial counsel should have objected to the testimony as non-responsive and as a violation of rule 404(b). *See* TEX. R. EVID. 404(b) (providing that extraneous-offense evidence is inadmissible in order to show action in conformity with character). We are not persuaded by this argument because the testimony provided by A.G. detailed actions that occurred after her mother observed the complained-of incident.

A.G.'s testimony reveals that her mother confronted Cueva about his actions, and then they fought. A.G. and her brother were sleeping in another room and were awakened when their mother yelled and screamed at Cueva. A.G. saw Cueva and her

---

[19] By this issue, Cueva also contends that counsel did not request, and the State did not provide, notice of extraneous offenses and acts of misconduct that it intended to offer. He states in a conclusory fashion that counsel's failure to request such notice was ineffective assistance. Cueva also summarily asserts that counsel's performance was deficient because he opened the door to and elicited this testimony from A.G. He cites no specific supporting authority, however, and provides no explanatory argument for these contentions. In accordance with rule 38.1(i) of the Texas Rules of Appellate Procedure, we will only consider contentions that are supported by clear and concise arguments with appropriate citations to authorities and to the record. TEX. R. APP. P. 38.1(i). Because these assertions are inadequately briefed, we will not consider them.

mother hit each other.  Cueva pushed her mother into the wall.  According to A.G.'s testimony, the police caught Cueva as he was leaving the house, after the fighting and yelling occurred.  This testimony did not concern a prior assault, as Cueva asserts. Instead, this testimony was about the night in question.

Any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a consciousness of guilt may be received as a circumstance tending to prove that he committed the act with which he is charged.  *See Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.).  Specifically, unsettled demeanor may show a consciousness of guilt.  *Lassaint v. State*, 79 S.W.3d 736, 744 (Tex. App.—Corpus Christi 2002, no pet.).  In addition, attempts to tamper with a witness, and any criminal act designed to reduce the likelihood of prosecution, constitutes evidence of "consciousness of guilt" on the part of the defendant.  *See Gonzalez v. State*, 117 S.W.3d 831, 842 (Tex. Crim. App. 2003); *Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999); *Ransom v. State*, 920 S.W.2d 288, 299. (Tex. Crim. App. 1996) (en banc) (op. on reh'g).

In the present case, evidence that Cueva assaulted A.G.'s mother immediately after she confronted him was relevant to show his unsettled and combative demeanor after the incident, which arguably indicated a consciousness of guilt.  *See Lassaint*, 79 S.W.3d at 744; *Torres*, 794 S.W.2d at 598.   And, as an assault against an adult witness, it could be seen as tampering with the witness.  *See Gonzalez*, 117 S.W.3d at 842. Accordingly, the evidence was admissible, and although unexpectedly volunteered by the witness on cross-examination, Cueva's trial counsel was not ineffective for failing to object.

Affording great deference to trial counsel's ability and indulging "a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance," *see Strickland*, 466 U.S. at 689, and that his actions were the result of sound and reasonable trial strategy, *Jaynes*, 216 S.W.3d at 851, we presume that trial counsel's performance was constitutionally adequate as to this complaint. *See Morales*, 253 S.W.3d at 696-97 (quoting *Goodspeed*, 187 S.W.3d at 392). Cueva has not shown otherwise, and the challenged conduct is not "so outrageous that no competent attorney would have engaged in it." *See Goodspeed*, 187 S.W.3d at 392.

### (v.) Prosecutor's Arguments at Guilt-Innocence Stage

### (a). Tactic of Defense Attorneys to Put Victim on Trial

Cueva complains that counsel should have objected when the prosecutor argued during summation that he used to be a defense lawyer and that "a standard tactic of defense attorneys, when your victim has done something indefensible, [is to] put the victim on trial instead and that's just what Mr. Cueva has tried to do." Cueva asserts that counsel's failure to object to this argument constituted deficient performance and no sound strategy could justify this omission.

The court of criminal appeals has condemned "final arguments that constitute uninvited and unsubstantiated accusations of improper conduct directed at a defendant's attorney." *Gomez v. State*, 704 S.W.2d 770, 771 (Tex. Crim. App. 1985) (concluding that the prosecutor's argument that a defense lawyer brought witnesses into court to "manufacture evidence" to get his client "off the hook" improperly struck at the defendant over the shoulders of counsel). However, the court of criminal appeals has noted a difference between improper remarks which are directed at defense counsel himself and

69

improper remarks which attack or disparage counsel's argument or theory of defense. *See Coble v. State*, 871 S.W.2d 192, 203-05 (Tex. Crim. App. 1993) (en banc) (approving the prosecutor's argument concerning a saying among lawyers that if you have neither the facts or the law on your side, "you argue something ridiculous"); *Gorman v. State*, 480 S.W.2d 188, 190 (Tex. Crim. App. 1974) (explaining that the prosecutor's comment "[d]on't let him smoke-screen you, he has smoke-screened you enough" was in response to defense counsel's argument attempting to minimize the defendant's prior criminal record).

In this case, the prosecutor's argument, aside from the irrelevant and inconsequential fact that the prosecutor used to be a defense attorney, did not inject any new facts or speculation into the argument that were not already before the jury. After arguing that it is a "standard tactic of defense attorneys, when your victim has done something indefensible, [to] put the victim on trial," the prosecutor continued with the following: "He wants you to believe there's a grand conspiracy here. It involves this little girl, the police, the S.A.N.E. nurse, the little girl's mother. They all conspired to jack him up, unfairly, unjustly."

The argument was a summary of the defense that Cueva presented, and it attacked the defense tactic and not the defense attorney himself. Moreover, whether Cueva's trial counsel labeled it a "conspiracy" defense or not, Cueva's own testimony and the arguments made by his counsel advanced the defensive theory that A.G.'s mother was attempting to get rid of Cueva so that A.G.'s mother could then return to, and be accepted by, her own family. As in *Coble* and *Gorman*, the prosecutor, in this case, was entitled to attack this theory as an attempt to shift the blame to A.G.

70

### (b). "Sexual Release"

Cueva asserts that counsel's performance was also deficient when he failed to object to the following argument made by the prosecutor:

> Also keep in mind that on this date in question, [A.G.'s mother] and the defendant had not had sex. He was looking to this child for sexual release. [A.G.'s mother] was tired. She was exhausted that day. Presumably she was not going to stay up and have sex with him. So who did he turn to? He turned to the daughter.

Cueva contends that no sound strategy could justify this omission.

The four permissible areas of closing argument include: summation of the evidence; reasonable deduction from the evidence; responses to argument of opposing counsel; and pleas for law enforcement. *See Jackson v. State*, 17 S.W.3d 664, 673-74 (Tex. Crim. App. 2000); *Alejandro v.* State, 493 S.W.2d 230, 231-32 (Tex. Crim. App. 1973). Relevant to this case, the court of criminal appeals has repeatedly stated "that counsel may in argument draw from the facts in evidence all inferences that are reasonable, fair, and legitimate and he will be afforded latitude without limitation in this respect as long as his argument is supported by evidence and offered in good faith." *Andujo v. State*, 755 S.W.2d 138, 144 (Tex. Crim. App. 1988) (en banc). And in making reasonable deductions from the evidence, the trial court may properly ask the jury to consider the circumstances surrounding the crime and what might have been on the defendant's mind at the time. *See Hudson v. State*, 675 S.W.2d 507, 511 (Tex. Crim. App. 1984) (en banc); *Gonzales v. State*, 831 S.W.2d 491, 494 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd).

In the present case, A.G.'s mother admitted, in her trial testimony, that she took a short shower that evening because she was "just exhausted." In addition, Cueva

71

testified that A.G.'s mother also complained that her stomach hurt and that A.G. wanted her mother to sleep with her that evening. The prosecutor's argument that Cueva then turned to A.G. for sex did not inject facts outside the record as now urged by Cueva. Rather, the argument asked the jury to consider the circumstance that A.G.'s mother was tired and not feeling well and, as a reasonable deduction, that she was probably unavailable and that Cueva might have been motivated to seek sex instead from A.G. Thus, we conclude the argument in question was not so clearly outside the wide latitude given to the prosecutor in closing argument that counsel was ineffective for failing to object.

Accordingly, affording great deference to counsel's ability, *see Jaynes*, 216 S.W.3d at 851, we conclude that there was nothing to which counsel should have objected. Counsel did not perform "below an objective standard of reasonableness" in this regard, and thus, counsel's decision not to object to the complained-of prosecutorial arguments made during the guilt-innocence stage of trial was not deficient. *See Ex parte Briggs*, 187 S.W.3d at 466.

### b. Punishment Stage

#### (i.) Testimony and Prosecutor's Argument about Changes in the Law

Cueva claims that he was denied effective assistance of counsel at the punishment stage when counsel did not object to testimony provided by Probation Officer Kimberly Escamilla regarding changes in the law. Cueva asserts that because certain legislative amendments had not taken effect at the time of the offenses, the challenged testimony was irrelevant and improper. *See* TEX. R. EVID. 401, 402. He also complains that counsel's performance was deficient when he did not object to the prosecutor's

72

summation of those changes.

Specifically, Cueva asserts that counsel should have objected when the prosecutor, during cross-examination, elicited from Officer Escamilla that (1) the law regarding sex offenses changed on September 1, 2007:   (2) subsequent to that change, a defendant convicted of aggravated sexual assault of a child younger than age six faces a minimum sentence of twenty-five years; (3) a defendant cannot receive probation from a jury for sex offenses committed after that date; and (4) Cueva benefitted by committing the offenses before the law changed.   *See* Acts 2007, 80th Leg., ch. 593, § 1.18 (changing the minimum term of imprisonment from five to twenty-five years for the aggravated sexual assault of a child younger than six years at the time of the offense) (current version at TEX. PENAL CODE ANN. § 22.021(f)(1)); Acts 2007, 80th Leg., ch. 593, § 1.06 (eliminating the possibility of probation for the conviction of indecency with a child, aggravated sexual assault of a child, or sexual assault, and the victim of the offense is younger than fourteen years when the offense is committed) (current version at TEX. CODE CRIM. PROC. ANN. art. 42.12, §  4(d)(5)); *see also* Acts 2007, 80th Leg., ch. 593, § 4.01(a)  (explaining that the change in law made by this Act applies only to an offense committed on or after September 1, 2007, and an offense committed before September 1, 2007, is covered by the law in effect when the offense was committed).   In addition, Cueva contends defense counsel should have objected when the prosecutor argued that the jury needed to do the right thing, which was to assess "life in prison" "because the minimum sentence for one count of aggravated [sexual assault] of a child is now 25 years prison," and the Legislature has changed the law and decided that "someone who would rape a six[-]year[-]old child should no longer receive probation … [b]ecause pedophiles

are dangerous."

Our review of the record shows that the State cross-examined Probation Officer Escamilla about a change in the law that became effective shortly after the date of the aggravated sexual assault in question, a change which would have increased the punishment for this offense from a five-year minimum to a twenty-five-year minimum and eliminated the possibility of probation for these offenses. Cueva's counsel did not object to this testimony. In addition, during her summation, the prosecutor commented on this fact, without objection.

In a non-capital felony trial, evidence is admissible during the punishment stage if "the court deems [it] relevant to sentencing." TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1). The court of criminal appeals recently addressed the relevance of punishment evidence as follows:

> The Legislature did not define the term "relevant" in the Code of Criminal Procedure, and beyond the few items enumerated in Article 37.07, it has not given any guidance as to what evidence is relevant to punishment. Borrowing from the definition of "relevant" in Texas Rule of Evidence 401 is of little avail because the factfinder's role during the guilt phase is different from its role during the punishment phase. Unlike the guilt phase, where the factfinder must decide discrete factual issues, deciding what punishment to impose is a "normative process, not intrinsically factbound." Thus, what is "relevant" to assessing punishment is "a function of policy rather than relevancy." Evidence is relevant if it helps the factfinder decide what sentence is appropriate for a particular defendant given the facts of the case.

*Hayden v. State*, 296 S.W.3d 549, 552 (Tex. Crim. App. 2009) (citations omitted).

It is clear that punishment against Cueva was to be assessed under the range of punishment for the offenses at the time they were committed, prior to September 1, 2007. However, because what is "relevant" to assessing punishment is a "function of policy

74

rather than relevancy" and deciding what punishment to impose is a "normative process, not intrinsically factbound," evidence involving subsequent changes in the law is arguably relevant to help the jury decide what sentence is appropriate for a particular defendant given the facts of the case, even though the exact the range of punishment is provided for by the applicable law. *Hayden*, 296 S.W.3d at 552. Importantly, Cueva provides no authority that suggests this evidence is so clearly irrelevant and improper that trial counsel may be held ineffective for failing to object to its admission or to the prosecutor's argument that includes that information, and we find none. Where there is no statute or case law that suggests this evidence is inadmissible, the law is unsettled, and we cannot conclude that trial counsel was ineffective for failing to object at trial. *See Ex parte Varelas*, 45 S.W.3d 627, 637 (Tex. Crim. App. 2001) (en banc); *see also Ex parte Roemer*, 215 S.W.3d 887, 894 (Tex. Crim. App. 2007); *Ex parte Chandler*, 182 S.W.3d 350, 359 (Tex. Crim. App. 2005).

In addition, proper jury argument includes, among other things, a plea for law enforcement and a summation of the evidence presented at trial. *Alejandro*, 493 S.W.2d at 231-32; *Jackson*, 17 S.W.3d at 673-74. Based on our review of the record, including the context in which the prosecutor made this argument, it would have been reasonable for counsel to interpret the summation as a plea for law enforcement or as a summation of the evidence. *See Alejandro*, 493 S.W.2d at 231-32; *Jackson*, 17 S.W.3d at 673-74. Therefore, in this regard as well, we would not conclude that counsel's performance was deficient.

### (ii.) Testimony Requesting that Cueva Receive a Life Sentence

Cueva asserts that because counsel elicited and failed to object to requests from

prosecution witnesses that Cueva receive a life sentence, his performance was deficient. Cueva argues that no sound strategy justifies counsel's conduct.

Counsel elicited from A.G's grandmother that she wanted Cueva to pay for what he did to her granddaughter by spending the rest of his life in prison and that she would not be happy unless he received a life sentence. Counsel then elicited an affirmative response when he asked if the witness was "not going to be happy unless he spends the rest of his life in prison." Later the prosecutor elicited from A.G.'s great-grandmother that justice would be the maximum penalty. Counsel did not object to this testimony. Other testimony at the punishment phase brought out that A.G.'s family did not like or approve of Cueva, even before the incidents for which he was convicted occurred. During his argument, Cueva's counsel then suggested that these witnesses were not seeking justice, but vengeance, in contrast to A.G. herself, who counsel claimed "did not come up here and tell you to throw Charles Cueva away for the rest of his life. Because the child can see the good, the redeemable in us."

The record supports a conclusion that it was sound trial strategy to show the bias of the prosecution witnesses in order to demonstrate that their requested punishment was unreasonable and in sharp contrast to what the defense believed would be a just outcome—that being to place Cueva on probation. Counsel made strategic decisions regarding this testimony, and decisions based in strategy do not constitute deficient performance. *See Strickland*, 466 U.S. at 689. Cueva has not shown, in the record, that counsel's conduct was not the product of a strategic decision, and we cannot conclude that counsel's conduct, in this regard, was so outrageous that no competent counsel would have engaged in it. *See Morales*, 253 S.W.3d at 696-97.

### (iii.) Opinion Testimony that Sex Offenders Cannot be Rehabilitated

Cueva contends that counsel's failure to object to the Probation Officer Escamilla's opinion that sex offenders cannot be rehabilitated constituted deficient performance and that no sound strategy would justify this omission. [20] Cueva also complains that counsel's performance was deficient because he did not object to the State's alleged failure to qualify Officer Escamilla.

On direct examination, defense counsel established, through Officer Escamilla's testimony, that "some sex offenders who are on probation do complete the probation" and that "[s]ome don't"; that there are "people though who end up not violating the probation, satisfactorily completing the probation, and being discharged from the program." On cross-examination, after testifying that she was not familiar with the rate of recidivism or rehabilitation of sex offenders, Officer Escamilla agreed with the State that she was aware that sex offenders cannot be rehabilitated and because they cannot be rehabilitated, the most a probation officer can do is try to get them to change their behavior. However, Officer Escamilla later testified on cross-examination that she was not familiar with a sex offender's compulsion to offend. And later on re-direct, when defense counsel asked Officer Escamilla whether Cueva's admission to some of the charges indicated that he was likely to be a good candidate for probation, Officer Escamilla testified that "if he did confess to some of the offenses then I would say, yes, that he is … seeking treatment," and if he did request help for what he had done to A.G., she agreed that such a desire

---

[20] Cueva also generally contends that counsel's performance was deficient because he failed to object to the prosecutor's closing argument that sex offenders "are not ever rehabilitated." However, Cueva cites no specific supporting authority and provides no explanatory argument for this contention. We will not consider this portion of Cueva's argument because it is inadequately briefed. *See id.*

played a big part in determining whether he would be a successful candidate for probation. Counsel was also able to overcome the State's objection that the witness had not been qualified to provide such testimony in response to counsel's question because the trial court determined the State had already gone into this area of questioning.

A trial court may admit expert testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. For an expert's opinion to be admissible, the proponent must establish that the expert is qualified to render the opinion and that the testimony is relevant and based on a reliable foundation. *Acevedo v. State*, 255 S.W.3d 162, 168 (Tex. App.—San Antonio 2008, pet. ref'd). A probation officer may give an opinion on a defendant's suitability for probation, either as a lay opinion under rule of evidence 701 or as an expert opinion under rule 702, based on her personal knowledge of the defendant. *Ellison v. State*, 201 S.W.3d 714, 722-23 (Tex. Crim. App. 2005); *see* TEX. R. EVID. 701 & 702. Defense counsel is not required to challenge the qualifications of every expert who testifies at trial. *Easley v. State*, 978 S.W.2d 244, 251 (Tex. App.—Texarkana 1998, pet. ref'd). This is true especially when the State could easily have demonstrated the expert's qualifications if called upon to do so and an objection would only have wasted the court's time or antagonized the jury. *Id.*

Although it appears from the record that Officer Escamilla's qualifications were established or at least conceded, even if they were not, we cannot conclude that counsel was required to challenge her qualifications. *See id.* The record is silent regarding whether the State could easily have proven Officer Escamilla's qualifications if they had been challenged at trial and an objection would have wasted the trial court's time or

78

antagonized the jury.  *See id.*  Therefore, we cannot conclude that trial counsel's performance was deficient when he did not object that the State did not establish Officer Escamilla's qualifications.  *See Acevedo*, 255 S.W.3d at 168.

Regarding the admission of rehabilitation testimony, Cueva relies on *DeLeon v. State.*  322 S.W.3d 375, 378, 384-87 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).  The *DeLeon* Court affirmed DeLeon's conviction but found that his counsel was ineffective during the punishment stage for presenting a probation officer as a witness and failing to object to the State's line of questions that resulted in "highly inflammatory testimony".  *Id.* at 385-86.  Cueva claims that *DeLeon* is instructive because his case is indistinguishable.  We disagree.

During the punishment hearing, *DeLeon*'s counsel called a probation officer who testified about counseling and treatment that sex offenders receive when they are placed on probation; through this education-type process, they learn to control their behavior and to remove themselves from high-risk situations.  *Id.* at 385.  On cross-examination by the State, the probation officer testified as follows:

> Q.    If in a particular case the facts were to show that what a person was convicted for was a situation where either through opportunity or through planning it was in a position where nobody else would see it, it was secretive; unless a child talked nobody would know.  Is that risk still there if the people around aren't trying to prevent that?
>
> A.    Sure.  That risk will always be there.  The risk will never disappear. Regardless if they get alone with the child, regardless if there are other adults in the house, the risk remains.  [P] The risk is in the brain.  It's up here.  It's the desire.  You can put a person in prison, you can do anything you want to them.  You cannot get rid of the deviancy, the sexual desire, in any offender.  [P] Sexual behavior is natural, but when it becomes deviant, that is when we get worries. Once it is with them, it doesn't disappear.  That is the purpose of treatment.  [P] Punishment—I don't care what kind of punishment

79

you give somebody, it never forces the issues out of their brain. They will always have some kind of deviant sexual desire, and they will always be at risk to the community. That is just the way it works.

*Id.* at 384-85. On re-cross, the probation officer expanded his testimony with the following:

> Q. Now rehabilitation of sex offenders: Are they ever rehabilitated to the point where the risk is gone?
>
> A. No. Absolutely not. The risk will always be there. It may be minimized or lessened, but the risk will always remain because we don't know what anybody here is thinking. We can never assume that we know what a sex offender is thinking. [P] The risk is this: they were sex offenders before they committed the offense. So we don't know what he is thinking, what they're planning. We can give them treatment, we can do all the things that are required by law; but we can't see up here, so we can never truly predict what is going to happen from day one to day two. [P] You have got to assume all the risk because you have heard story after story, "I never thought he would do this; I never thought my grandfather would do this; I never thought my dad would do this." [P] So you never, ever push out the risk. You always assume the risk is great, then hopefully that is going to create enough protection to prevent other children from being impacted one way or the other. You just don't know. [P] I can have guys that do everything perfectly, but up here they're still having sexual fantasies of molesting two-year-old girls or two-year-old boys. Just because you succeed well in probation does not remove the risk.

*Id.* at 385. The probation officer then listed various problems he had encountered as a probation officer dealing with sex offenders and concluded by testifying that "[i]f you want to protect the public, then you put them in a situation where they can't have access to children." *Id.*

Based on the above testimony, the *DeLeon* Court concluded that, even without determining whether the officer was qualified to give expert opinion testimony such that the testimony on these matters was admissible on that basis, the "testimony was

80

particularly damaging to appellant's prospects for probation or a short prison sentence" and that "trial counsel was deficient in failing to object to the highly inflammatory testimony and for calling [the officer] to the stand in the first place" because he "should have known how [the officer] was going to testify on these matters." *Id.* at 385-86. Finally, the Fourteenth Court of Appeals determined that "[t]here could have been no strategic reason for producing and permitting such damning testimony." *Id.* at 386.

The *Deleon* Court's reversal was not based on the fact that counsel failed to object to the probation officer's qualification to render an opinion, but rather on the highly inflammatory nature of the officer's testimony as a whole. *Id.* at 385-86. Thus, it provides no support for Cueva's qualification argument. Cueva does not complain that counsel's performance was deficient for calling Officer Escamilla to the stand, as did the appellant in *DeLeon*. *See id.* Instead, he contends only that counsel was deficient in failing to object to testimony regarding rehabilitation.

As to Officer Escamilla's rehabilitation testimony, while she agreed that sex offenders cannot be rehabilitated, she also agreed that one can try to get a sex offender to change his behavior, which would support a conclusion that the risk may be minimized or lessoned. Additionally, Officer Escamilla testified, somewhat inconsistently during her second cross-examination, that she was not familiar with a sex offender's compulsion to offend. We cannot conclude that this testimony is "highly inflammatory" and "damning" testimony. *See id.* at 384-85. It falls far short of the testimony condemned by the *DeLeon* Court, and *DeLeon* is therefore also distinguishable for that reason. *See id.*

Finally, by allowing the State's line of questioning, counsel was later able to ask Officer Escamilla whether Cueva's admission to some of the charges indicated that he

was likely to be a good candidate for probation. The trial court overruled the State's objection to this line of questioning on the basis that the State had already gone into this area. Therefore, unlike *DeLeon*, Cueva has not shown in the record that counsel's conduct was not the product of a strategic decision. *See id.* at 386. Because we cannot conclude that counsel's conduct, in this regard, was so outrageous that no competent counsel would have engaged in it, we must, therefore, presume that his performance was constitutionally adequate. *See Morales*, 253 S.W.3d at 696-97.

### (iv.) Testimony that Cueva Committed Extraneous Offenses

Cueva asserts that counsel's conduct in eliciting, opening the door to, and failing to object to certain inadmissible extraneous offenses based on hearsay constituted deficient performance. He claims that no sound strategy could justify this conduct.

In support of his argument, Cueva relies on *Ex parte Walker*. 777 S.W.2d 427, 432 (Tex. Crim. App. 1989) (en banc). The court of criminal appeals in *Ex parte Walker* held that counsel was deficient for allowing in and discussing Walker's adjudicated extraneous offense during the punishment stage. *Id. Ex parte Walker* was decided under the former statute, which generally did not permit extraneous offenses to be admitted. *Id.* The law has since changed, and unadjudicated extraneous offenses are now admissible during punishment if the State proves them beyond a reasonable doubt. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a); *see Mitchell v. State*, 931 S.W.2d 950, 954 (Tex. Crim. App. 1996) (en banc).

Nonetheless, Cueva objects to certain references to a prior assault against A.G.'s mother and to Cueva's prior driving while intoxicated (DWI) arrests. Reference to the prior assault occurred during the punishment stage when, during cross-examination of

A.G.'s grandmother, Cueva's counsel appeared to be developing the reasons for, and the extent of, her disapproval of Cueva, including the fact that she had called the police and gotten him arrested. On cross-examination of A.G.'s great aunt, Cueva's counsel also developed her dislike for Cueva and how she was angry that all charges against Cueva for the prior assault had been dropped.

During direct examination of defense witness Adan Barrera, Cueva's counsel allowed the witness to detail what he knew about Cueva. Barrera stated, among other things, that Cueva was "a good father," "a great person," and agreed that he was "a responsible person." On cross-examination, the State then asked whether Cueva was a good father and a responsible person when he beat his girlfriend in front of his daughter and got arrested twice in one year for DWI. Finally, during direct examination of Cueva's father, counsel asked what kind of person Cueva was and whether he could follow the rules and conditions of probation, and his father answered that Cueva was "a great man, good man." On cross-examination, the State elicited testimony from Cueva's father that he knew about Cueva's DWI arrests but not about his arrest for beating A.G.'s mother.

The record supports a conclusion that it was sound trial strategy to show the grandmother's and great-aunt's dislikes for, and biases against, Cueva to demonstrate that their requested punishment was unreasonable. Counsel also took a strategic risk in asking about the kind of person Cueva was, perhaps seeking sympathy for Cueva. By doing so, counsel had no basis to object to the State's impeachment of those witnesses with prior bad conduct. Thus, we conclude counsel made strategic decisions regarding this testimony. *Strickland*, 466 U.S. at 689. Again, Cueva has not shown, through the record, that counsel's conduct was not the product of a strategic decision, and we cannot

83

conclude that counsel's conduct, in this regard, was so outrageous that no competent counsel would have engaged in it. *See Morales*, 253 S.W.3d at 696-97.

We also note that the punishment charge contained a paragraph instructing the jury not to consider testimony concerning extraneous offenses if it was not proved beyond a reasonable doubt. Therefore, counsel's performance was not ineffective for this reason.

### (v.) Prosecutor's Punishment-Stage Arguments

### (a). Cueva "Attacked" A.G.

Cueva complains that counsel's failure to object to the following portion of the prosecutor's closing argument on punishment was deficient, not strategic:

> All we know is that he touched his penis on her anus and on her vaginal area, and even after he had done all of that, when he was caught in the act, he basically turned the tables on her and ended up during this trial victimizing her again by attacking her.

Cueva claims that, by this argument, the prosecutor was arguing that Cueva victimized A.G. by going to trial and making her testify, an argument he contends is improper and should have required a mistrial. *See, e.g., Villarreal v. State*, 860 S.W.2d 647, 650 (Tex. App.—Waco 1993, no pet.) (concluding that the prosecutor's argument equating the fulfillment of the constitutional right to a jury trial by requiring a complainant to testify about the defendant raping the child complainant again by going to trial was extreme and so manifestly improper and harmful that no instruction to disregard could reasonably remove it from the minds of the jurors). The prosecutor, however, did not say that Cueva victimized A.G. by making her go to trial and testify against him, as Cueva asserts. Rather, the prosecutor argued that Cueva "ended up during this trial victimizing

[A.G.] again by attacking her." She did not explain or expand upon her statement.

Moreover, Cueva concedes, on appeal, that the prosecutor was arguing that Cueva attacked A.G.'s credibility.[21] And Cueva, himself, testified that A.G. was lazy in the mornings, made excuses to get out of going to school, and got rashes because she did not know how to clean herself properly. Such testimony could be seen as an embarrassing and demeaning attack on A.G. Cueva also testified that A.G.'s mother "went all psycho on me, saying all kind of retarded stuff" and that "I know what kind of person she is." The prosecutor could have been referring to this testimony when arguing that Cueva victimized A.G. again by attacking her during the trial.

Cueva provides us with no record citations to support his characterization of the prosecutor's argument. And he has not referred this Court to any controlling authority to show that an objection would have been sustained or, if overruled, would have constituted reversible error, and we find no such authority. *See Miniel v. State*, 831 S.W.2d 310, 324 (Tex. Crim. App. 1992) ("While the prosecutor's misstatement of the evidence regarding fingerprints on the shock absorber was improper and would have been subject to an objection, even had such been erroneously overruled such error would certainly not have been reversible."); *see also Holland v. State*, 761 S.W.2d 307, 319 (Tex. Crim. App. 1988) ("[T]rial counsel was under no obligation to do what would amount to a futile act.").

Therefore, affording great deference to counsel's ability, *see Jaynes*, 216 S.W.3d at 851, we conclude that there was nothing to which counsel should have objected.

---

[21] In his appellate brief, Cueva comments that "[t]here is no evidence in the record that [Cueva] physically attacked [A.G.] during the trial," rather "the prosecutor meant that [Cueva] challenged [A.G.'s] credibility."

85

Counsel did not perform "below an objective standard of reasonableness" in this regard, and thus, counsel's decision not to object to this argument was not deficient in this instance. *See Ex parte Briggs*, 187 S.W.3d at 466.

### (b). Life Sentences and Another Trial

Cueva asserts that the prosecutor's closing arguments that A.G. and the police officers wanted a particular punishment and that there was a pending charge in Mission, Texas, involving A.G., which could result in another trial depending on the punishment assessed in this trial, were improper and should have been objected to by counsel. Cueva contends that these arguments were improper because there was no evidence in the record to support such a summary, and the summary was not a reasonable deduction from the evidence. *See Dorsey v.* State, 709 S.W.2d 207, 210 (Tex. Crim. App. 1986) (en banc) ("[I]f a prosecutor wants to argue that a victim desires his or her assailant incarcerated, then these facts need to be in evidence."); *see also Alejandro*, 493 S.W.2d at 231-32 (setting out four areas of a proper jury argument); *Jackson*, 17 S.W.3d at 673-74 (same).

Specific to this complaint, the prosecutor argued the following:

> The community has no choice with your decision. Whatever you decide, Robstown[, Texas] is stuck with. I find it interesting that the defense is arguing that [A.G.] does not want [Cueva] to go to prison. That's not true. [A.G.] wants [Cueva] in prison for the rest of his life. So does her family. The detective–-the detectives in this community is [sic] asking for a life sentence.
>
> ….
>
> Now it is your turn to affirm [A.G.] What would be affirmation here for this horrible brutal crime is 99 years [in] prison. At least give [A.G.] the comfort of knowing that [Cueva] will never ever get out of prison. By giving

86

[Cueva] a high sentence, [A.G.] will not have to go through another trial in Mission, Texas. This will be it.

Based on our review of the record, including the prosecutor's entire closing argument, it would have been reasonable for counsel to interpret the prosecutor's argument as a plea for law enforcement rather than a summary of the testimony of the witness. *See Jackson*, 17 S.W.3d at 673-74. Moreover, even were we to agree with Cueva's interpretation that the prosecutor was arguing that everyone wanted Cueva in prison for life, this is consistent with Cueva's trial strategy to show that the prosecution witnesses were biased against him, a strategic reason for not objecting. *See Strickland*, 466 U.S. at 689 (providing that decisions based in strategy do not constitute deficient performance). And to the extent we would conclude that counsel's failure to object was improper, we would further conclude that it did not fall below an objective standard of reasonableness under the prevailing professional norms. *See Ex parte Briggs*, 187 S.W.3d at 466.

As for the prosecutor's argument that A.G. would have to endure another trial in Mission, Texas, if the jury did not assess a long sentence, counsel may have decided not to object in order to avoid highlighting such an argument or encouraging the jury to dwell on the possibility of another trial. *See Garcia*, 887 S.W.2d at 881. He may also have decided that the jury's speculation that, whatever sentence they imposed, Cueva might still be subject to prosecution and punishment in a separate case, which would work in his favor.

Thus, we conclude counsel made strategic decisions regarding the prosecutor's argument. Cueva has not shown that counsel's conduct was not the product of a

87

strategic decision, and we cannot conclude that counsel's conduct, in this regard, was so outrageous that no competent counsel would have engaged in it. *See Morales*, 253 S.W.3d at 696-97.

### (vi.) Counsel's Argument that It Was Not His Job to Seek Justice

Cueva asserts that it was unsound for his counsel to execute a purported strategy by arguing as part of his punishment summation that it was not his job to see that justice was done. Cueva contends that this argument is inconsistent with any reasoned punishment strategy, and therefore, counsel's conduct was objectively deficient.[22]

Counsel presented the following summation at the close of the punishment stage:

> I want you to think beyond just the argument the prosecution is going to make when they talk about justice. In the [c]ode of [c]riminal [p]rocedure, the prosecutor's job is to see that justice is done. That's not my job. My job is to make the best plea for my client that I can possibly do. That is what I am doing to you here today. Without shame, without embarrassment of any kind whatsoever, I am here pleading for the life of my client, Charles Anthony Cueva.

In this closing argument, counsel referred to the prosecutor's job—one of seeking justice–-and to his job–-one of pleading for his client. It is reasonable to conclude that counsel was explaining each counsel's respective function at trial, emphasizing that defense counsel does not have a generalized duty to seek justice, as does the prosecutor. Rather, defense counsel is to make the best case he can for his client, which would include arguing the evidence to support an acquittal or a light punishment. It is

---

[22] Again, Cueva relies on *Craig v. State*, this time in support of his general conclusion that counsel's conduct was objectively deficient. *See* 847 S.W.2d at 436. As noted earlier, however, the *Craig* Court considered the effect of counsel's alleged errors at the punishment stage by applying the then-accepted *Duffy* standard of review, not the *Strickland* standard. *See id.* at 435 (citing *Ex parte Duffy*, 607 S.W.2d 507, 514 n.14 (Tex. Crim. App. 1980)); *see also Strickland*, 466 U.S. at 689; *Ex parte Walker*, 777 S.W.2d 427, 430 (Tex. Crim. App. 1989). Therefore, we do not agree that *Craig* supports Cueva's argument for reversal in this case.

also reasonable strategy for the defense counsel to talk with the jury about his role in order to build credibility, to avoid the appearance that he is trying mislead or behave unethically, and to be candid about his client's shortcomings. *See Martin v. State*, 265 S.W.3d 435, 446 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (quoting *Yarborough v. Gentry,* 540 U.S. 1, 9 (2003) ("By candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case.")).

Thus, we conclude counsel made strategic decisions regarding this argument. Cueva has not shown, in the record, that counsel's conduct was not the product of a strategic decision, and we cannot conclude that counsel's conduct, in this regard, was so outrageous that no competent counsel would have engaged in it.[23] *See Morales*, 253 S.W.3d at 696-97.

## 3. Summary

Accordingly, having concluded that the trial court did not abuse its discretion in denying ineffective-assistance-of-counsel challenges made by Cueva in his motion for new trial, we overrule Cueva's third and fourth issues as to those claims. We also overrule the third and fourth issues as to Cueva's additional claims because we have concluded that counsel's performance as to each of the additional claims was not ineffective under *Strickland*.

---

[23] Cueva also complains that the alleged errors collectively prejudiced his defense. Having concluded that Cueva did not satisfy *Strickland*'s deficiency prong by a preponderance of the evidence as to each alleged individual error or having concluded that, if his performance was deficient, there was no prejudice shown, we need not address Cueva's "collective prejudice" argument. *See Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010) (providing that a defendant must satisfy both of *Strickland*'s prongs by a preponderance of the evidence); *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *see also Strickland*, 466 U.S. at 687; *see also* TEX. R. APP. P. 47.1.

## IV.  CONCLUSION

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
2nd day of May, 2011.